**LEWYT CORP.**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 184, Docket 22871.

United States Court of Appeals Second Circuit.

Argued April 15, 1954.

Decided July 14, 1954.

Freidin & Littauer, New York City (Eugene Meacham, Fred R. Tansill and Seymour Sheriff, Washington, D. C., of counsel), for petitioner.

H. Brian Holland, Asst. Atty. Gen. (Ellis N. Slack, Lee A. Jackson, and I. Henry Kutz, Sp. Assts. to Atty. Gen., of counsel), for respondent.

Before CLARK, HINCKS and HAR-LAN, Circuit Judges.

HARLAN, Circuit Judge.

We are asked to review a decision of the Tax Court, 18 T.C. 1245, determining a deficiency of $7,129.21 in petitioner's income tax for the taxable year ended September 30, 1944, and a deficiency of $466,557.19 in excess profits tax for the taxable year ended September 30, 1945. The taxpayer is a New York corporation engaged in the manufacture of vacuum cleaners and electronic devices. For tax purposes it used a fiscal year ending each September 30 and reported on an accrual basis. Each fiscal year referred to in this opinion will be designated simply by the calendar year in which it ended.

In the two years in question § 23(s) of the Internal Revenue Code, 26 U.S.C.A. § 23(s), provided that in computing net income there should be allowed as a deduction (from gross income) the "net operating loss deduction" provided in § 122, 26 U.S.C.A. § 122. Section 122(a) defines " 'net operating loss' " as "the excess of the deductions allowed by this chapter over the gross income, with the exceptions, additions, and limitations provided in subsection (d)." We are not concerned here with any of the provisions of subsection (d) except that contained in (d) (6) which permits the deduction of taxes "imposed by Subchapter E of Chapter 2 [excess profits taxes] paid or accrued within the taxable year," subject to certain rules not presently relevant. If a taxpayer has a net operating loss for a given taxable year, § 122(b) (1) and (2) and § 122 (c) [1] provide that it may

---

1. "§ 122. Net operating loss deduction
\* \* \* \* \* \*
"(b) Amount of carry-back and carry-over.

"(1) Net operating loss carry-back. If for any taxable year beginning after December 31, 1941, the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-back for each of the two preceding taxable years, except that the carry-back in the case of the first preceding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the second preceding taxable year computed (A) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and (B) by determining the net operating loss deduction for such second preceding taxable year without regard to such net operating loss.

"(2) Net operating loss carry-over. If for any taxable year the taxpayer has a net operating loss, such net operating loss shall be a net operating loss carry-

be applied, in accordance with prescribed specifications, as a deduction in computing net income for the two preceding taxable years (called a "carry-back") and for the two succeeding taxable years (called a "carry-over"), the starting point being with the second preceding taxable year, and any excess being carried successively, until exhausted, into the subsequent years ending with the taxable year secondly succeeding the year in which the net operating loss occurred.

The taxpayer had net operating losses in each of the years 1946 and 1947, and the dispute we have before us relates primarily to (a) the proper computation of such losses for each of those years, and (b) the application of such losses to the years 1944 and 1945, in each of which the taxpayer had substantial taxable net income.

We come first to the questions relating to the year 1945 in respect of which the Tax Court sustained the determination of the Commissioner that there was a deficiency in excess profits taxes of more than $460,000.

The Commissioner determined that in 1947 the taxpayer had a net operating loss of $786,383.25, which he allowed as a "carry-back" deduction to 1945. The taxpayer claimed additional "carry-backs" to 1945 aggregating $1,381,402.33 by reason of (a) the remittance to the Collector in 1947 of $300,008.87 in respect of excess profits taxes for the years 1943, 1944 and 1945 which, it is asserted, should have been added to the net operating loss for 1947; (b) the remittance to the Collector in 1947 of $55,949.04 interest on the foregoing amount and on some $12,000 of additional income taxes for 1943, which, it is claimed, should also have been added to the 1947 net operating loss; and (c) the failure to allow any portion of the net operating loss for 1946, claimed to be $1,025,444.42, as a "carry-back" to 1945. Each of these claims was denied by the Commissioner, who was sustained by the Tax Court. The taxpayer also contends that the Tax Court erred in failing to credit on the asserted excess profits tax deficiency for 1945 the sum of $108,437.36, which the taxpayer remitted to the Commissioner in 1947 in respect of 1945 excess profits taxes (this amount being part of the $300,008.87 referred to above).

1. *1947 Principal Remittances*

These remittances aggregating $300,-008.87 were made under the following circumstances:

Prior to 1947, a dispute arose between the taxpayer and the Collector as to the taxpayer's 1943 tax liability. On August 30, 1946, the Collector issued a statutory

over for each of the two succeeding taxable years, except that the carry-over in the case of the second succeeding taxable year shall be the excess, if any, of the amount of such net operating loss over the net income for the intervening taxable year computed (A) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and (B) by determining the net operating loss deduction for such intervening taxable year without regard to such net operating loss and without regard to any net operating loss carry-back. For the purposes of the preceding sentence, the net operating loss for any taxable year beginning after December 31, 1941 shall be reduced by the sum of the net income for each of the two preceding taxable years (computed for each such preceding taxable year with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6), and computed by determining the net operating loss deduction without regard to such net operating loss or to the net operating loss for the succeeding taxable year).

"(c) Amount of net operating loss deduction. The amount of the net operating loss deduction shall be the aggregate of the net operating loss carry-overs and of the net operating loss carry-backs to the taxable year reduced by the amount, if any, by which the net income (computed with the exceptions and limitations provided in subsection (d) (1), (2), (3), and (4) ) exceeds, in the case of a taxpayer other than a corporation, the net income (computed without such deduction), or, in the case of a corporation, the normal-tax net income (computed without such deduction and without the credit provided in section 26(e) ) * * *."

notice asserting income and excess profits tax deficiencies for 1943 in the amount of $7,757.49 and $194,992.51, respectively. The taxpayer objected to these deficiencies and took the matter to the Tax Court. Meanwhile, settlement negotiations were opened. On September 29, 1947, the taxpayer's auditor, believing that a formula for settlement had been reached, recomputed the tax liability for 1943 and sent the Collector a check for $190,002.16, of which $154,473.30 represented additional taxes for 1943 computed in accordance with the supposed settlement formula, and $35,528.86 the interest on such sum from December 15, 1943. The Collector deposited this check on September 29, 1947 in his "Suspense Account."

Notwithstanding this transaction, settlement conferences continued down to October 30, 1947, when they were broken off, the Head of the Technical Staff of the New York Division advising the Division Counsel on November 6, 1947 that a satisfactory settlement had not been reached and that defense of the case should proceed. However, negotiations were evidently resumed, for on February 24, 1948 a settlement stipulation was filed settling, among other things, the asserted 1943 excess profits tax deficiency for the sum of $140,147.87, which was $1,470.26 less than the amount attributable to excess profits taxes ($141,618.13) in the taxpayer's remittance of September 29, 1947.

On September 29, 1947, the taxpayer also forwarded to the Collector a check for $178,810.92, stated in the letter of transmittal to represent additional taxes of $49,953.38 for 1944, with interest in the amount of $8,492.07, and of $108,437.36 for 1945, with interest in the amount of $11,928.11. This remittance was predicated on a Revenue Agent's examination of the taxpayer's books for 1944 and 1945 (as well as 1946 and 1947), and a computation by the taxpayer's auditor applying in respect of excess profits taxes the same supposed settlement formula as underlay the taxpayer's remittance relating to 1943 excess profits taxes. Although no deficiency notice had been issued, and no settlement negotiations had been begun as to 1944 and 1945 taxes, the factors giving rise to the alleged excess profits tax deficiency for 1943 were deemed equally applicable to 1944 and 1945. The Collector also deposited this second remittance in his "Suspense Account."

The taxpayer charged on its books to earned surplus the principal amounts of these two remittances as tax payments, *viz.:* $154,473.30 for 1943, $49,953.38 for 1944, and $108,437.36 for 1945. Of the first item, $12,855.17 represented income taxes (with which we are not concerned here) and the balance, aggregating $300,008.87, represented excess profits taxes. The interest payments on these three items were charged to 1947 expense on the taxpayer's books, *viz.:* $35,528.86 (1943), $8,492.07 (1944) and $11,928.11 (1945), or a total of $55,949.04.

The taxpayer's position that the $300,008.87 of remittances in respect of excess profits taxes should have been allowed as a deduction in computing the net operating loss for 1947 (thereby increasing the "carry-back" to 1945) rests upon § 122(d)(6). As heretofore noted, this section gives a deduction for "the amount" of excess profits taxes "imposed" which were "paid or accrued within the taxable year".

Preliminarily it should be said that while there is an issue relating to the computation of the 1946 net operating loss (which we discuss later) as to the correctness of the Tax Court's holding that in the case of an accrual taxpayer, as this taxpayer was, this section permits only the deduction of excess profits taxes which *accrued* within the taxable year, for the point now under discussion the taxpayer accepts the decision of the Tax Court in this respect as being correct. It can afford to do so since it is clear that none of these excess profits taxes had accrued prior to 1947 because they were in dispute—see Dixie Pine Products Co. v. Com'r, 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270—and whether they accrued in 1947 depends

upon whether they can be considered as "paid" in that year despite the fact that the dispute over them was not settled until at least 1948. See Chestnut Securities Co. v. United States, 1945, 62 F. Supp. 574, 104 Ct.Cl. 489, and Lehigh Valley Railroad v. Com'r, 1949, 12 T.C. 977. So the sole question with which we are now concerned is whether these 1947 remittances constituted taxes "paid" within the taxable year, that is 1947, within the meaning of § 122(d)(6). We think they did not.

■ A remittance made in respect of an asserted or putative tax liability in no proper sense constitutes a tax "payment" except to the extent that it is effective to discharge such liability in whole or in part. That in turn depends upon the agreement of the taxpayer and the Commissioner or his representatives, acting within their powers, or upon whether the taxing authorities have a duty under the particular circumstances involved to accept the remittance as a payment of the tax in full or *pro tanto*.

■ Here there was admittedly no agreement in this respect between the taxpayer and the taxing authorities in 1947, and the only question is whether the Collector was, in the setting of these remittances, under a duty to accept them as "payments" *pro tanto* of the asserted or putative tax liabilities against Lewyt. We think he had no such duty. The taxpayer's 1943 tax liability was still in dispute on September 29, 1947, when these remittances were made. Settlement negotiations continued into 1948, and no settlement was reached until February 1948. Meanwhile the taxpayer's proceedings in the Tax Court remained alive. With respect to 1944 and 1945 taxes, the Revenue Agent had commenced his examination of the taxpayer's 1944 and 1945 returns, and it was clear that the same issues giving rise to the Commissioner's deficiency notice of August 30, 1946 as regards 1943 taxes were also involved for 1944 and 1945. So far as the record discloses, deficiency notices for 1944 and 1945 were not issued until February 16, 1950; and, in any event, it is clear that the controversy as to those issues present in the 1943 dispute, which were also applicable to 1944 and 1945, was active until at least 1948.

In these circumstances, we think that the action of the Collector in placing these 1947 remittances in his "Suspense Account" to abide the event of the disposition of these disputes was quite proper. The taxpayer was not entitled to have these remittances treated as a satisfaction of its tax liabilities in whole or in part, and at the same time continue to contest such liabilities, or at best leave the Collector with an ambiguous situation on his hands.

Rosenman v. United States, 1945, 323 U.S. 658, 65 S.Ct. 536, 538, 89 L.Ed. 535, while not reaching the precise point we have here, does support our view of the matter. In that case the Supreme Court held that the period of limitation on refund claims provided in § 910, I.R.C., 26 U.S.C.A. § 910, requiring such claims to be presented within three years "after the payment of such tax", commenced to run from the time the Commissioner assessed the tax rather than from an earlier time when the taxpayer had made a general payment on account of estimated estate taxes. Stating that "payment" of a tax as contemplated by § 910, I.R.C., "plainly presupposes challenged action by the taxing officials" in response to which a remittance is made, the Court under the facts of that case held that no "tax payment" occurred until there had been an assessment followed by its satisfaction in part out of moneys already deposited with the Collector and in part by additional amounts paid by the taxpayer in response to such assessment, since it was only at that point that interest began to run against the Government on any amount in excess of that ultimately found due as the tax. While we do not read Rosenman to foreclose treating as a tax payment any remittance made prior to assessment, we do think that it supports the view that a remittance which does not *satisfy* an as-

serted tax liability should not be treated as the "payment" of a tax. Satisfaction may, as in Rosenman, follow from payment of a tax assessed, for such a payment extinguishes the asserted liability, even though the taxpayer is left with an independent claim for refund which survives the discharge of the assessment. Or it may follow from the payment of an asserted liability in advance of assessment, as appears to be contemplated by § 56(d), I.R.C., 26 U.S.C.A. § 56(d), and 26 C.F.R. 601.13(b)(2),[2] *if*, as is expressly provided in the latter and by necessary implication in the former, the payment is accompanied by the taxpayer's acquiescence in the proposed deficiency. The same holds true as to § 271 (a)(1)(B), 26 U.S.C.A. § 271a(1)(B), requiring that amounts "collected without assessment" be excluded from the computation of a deficiency, for here again acquiescence by the taxpayer in such collections as constituting satisfaction of part of his tax liability is a condition necessarily to be implied. In short, there can be no payment without satisfaction whether pursuant to or apart from an assessment. Here the taxpayer was tendering its check with one hand, and contesting its liability to pay with the other. Its Tax Court proceedings as to the 1943 deficiency still stood, and that avenue was still open to it as to 1944 and 1945 taxes.

The taxpayer is quite mistaken, we believe, in reading Rosenman as standing for the proposition that the 1947 remittances should be treated as tax payments *ab initio* to the extent of the taxes ultimately found owing because they were effective to stop the running of interest against the taxpayer. The initial Rosenman payment was found not to be a tax payment despite the fact that the Court recognized that it stopped penalties and, as the Government conceded, interest *against the taxpayer*. It was found not to be a tax payment because it gave rise to no interest claim *against*

*the Government*. The situation here is no different. Nor do we find such decisions as Hanley v. United States, 1945, 63 F.Supp. 73, 105 Ct.Cl. 638, inconsistent with our conclusion, for there the taxpayer did not negative "payment" by simultaneous contest. Cf. Murphy v. United States, D.C.S.D.Cal.1948, 78 F. Supp. 236.

We hold that the 1947 remittances did not constitute "payment" of the taxpayer's 1943, 1944 and 1945 tax liabilities. They were no more than deposits "made in the nature of a cash bond for the payment of taxes thereafter found to be due." Rosenman, 323 U.S. at page 662, 65 S.Ct. at page 538.

The taxpayer also argues that the Tax Court's order entered on the 1948 stipulation settling the 1943 excess profits tax liability binds the Government by way of collateral estoppel from now asserting that the 1947 remittance in respect of the 1943 tax was not a payment of the tax. We need not dwell on this contention. It seems clear (although the pleadings are not before us) that the settlement was concerned only with the *fact* of payment and not with its *date.* The item in the stipulation "Tax paid: September 29, 1947 (3rd NY)" does not persuade us that the question we now have before us was really at issue in the Tax Court.

**2.** *1947 Interest Payments*

For the same reasons the taxpayer's contention as to the deductibility of the 1947 interest payments in respect of 1943, 1944 and 1945 taxes must also fail.

**3.** *1946 Net Operating Loss*

The taxpayer challenges the determinations of the Commissioner and the Tax Court as to the amount of the 1946 net operating loss.

As determined below, the net operating loss for 1946 was $164,326.38. The taxpayer argues that it should have been increased by $861,118.04, being the

---

**2.** See also informal ruling of Internal Revenue Bureau contained in Prentice-

Hall Federal Tax Service, 1950, **par.** 76,331.

amount of the excess profits taxes which it paid in that year in respect of 1945.

This requires us to interpret the phrase "paid or accrued" in § 122(d)(6) permitting the deduction of excess profits taxes "paid or accrued within the taxable year" in the computation of the net operating loss under § 122(a). As already noted, it was unnecessary to reach this problem with respect to the 1947 net operating loss. The Tax Court held that "paid or accrued" meant that a *cash* taxpayer was entitled to deduct only excess profits taxes "paid," and an *accrual* taxpayer only those "accrued," within the taxable year, and that since Lewyt was an accrual taxpayer this sum of $861,118.04 could only be reckoned in Lewyt's tax computations for 1945. We think the Tax Court was right.

We start with the statute itself. Section 48(c), I.R.C., 26 U.S.C.A. § 48, provides that "When used in this chapter" (that is, Chapter 1 entitled "Income Tax") "the terms * * * 'paid or accrued' shall be construed *according to the method of accounting upon the basis of which the net income is computed under this Part* [IV "Accounting Periods and Methods of Accounting"]".[3] See also T.R. 29.43–1. Section 43, I.R.C., 26 U.S.C.A. § 43, captioned "Period for which deductions and credits taken", states: "The deductions and credits * * * provided for in this chapter [1] shall be taken for the taxable year in which 'paid or accrued' * * * dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period."

The taxpayer makes a number of arguments to avoid what we think to be the plain effect of these provisions. We consider first its argument based on legislative history. Section 202(a) of the Revenue Act of 1941 amended § 23(c) of the Internal Revenue Code to permit deduction of Chapter 2E excess profits taxes "paid or accrued within the taxable year" in computing net income, subject to certain rules provided in § 23(c)(2), one of which, "A," stated: "The deduction shall be limited to the tax *imposed* for the taxable year, but any portion of such tax paid *after* the taxable year shall be considered as having been paid *within* the taxable year * * *." The taxpayer here points out, and we think correctly, that this last quoted provision in effect placed cash and accrual taxpayers substantially on an *accrual* basis so far as the excess profits tax deduction was concerned. Then came the Revenue Act of 1942 which by § 105(c) eliminated Chapter 2E excess profits taxes as a deduction in computing net income, but added, by § 105(e)(3)(C), a new Section, § 122(d)(6), permitting the deduction of such excess profits taxes from gross income in computing the net operating loss, and net operating loss "carry-backs" and "carry-overs," subject to rules which were the same as those presently contained in § 122(d)(6).

Pointing out that these rules are substantially the same as those formerly contained in § 23(c)(2) as amended by the Revenue Act of 1941, except that rule "A" of that section, quoted above, was omitted, the taxpayer argues that one of two inferences should be drawn— either that the Congressional intent was that the basis of deductibility of excess profits taxes should follow the taxpayer's method of accounting, *i. e.*, cash or accrual, or that in this respect the Act gave a taxpayer, whether cash or accrual, an election to deduct such taxes if either paid or accrued. It is urged that the latter inference is the more compelling, it being argued, as we shall see in a moment, that to draw the first inference would attribute to Congress an intention to "discriminate" between cash and accrual taxpayers, in that an accrual taxpayer, absent such an elec-

---

**3.** All italics in this opinion have been supplied.

tion, would rarely be able to take an excess profits deduction in a "loss" year.

We think that without more the arguments for and against these opposing inferences would at best present a stand-off. But we need not pause to examine them further, for here we have the explicit direction of § 43 that this deduction "shall be taken for the taxable year in which 'paid or accrued' * * * *dependent upon the method of accounting upon the basis of which the net income is computed,* unless in order to clearly reflect the income the deductions * * should be taken as of a different period." Certainly the exception would have no application in this instance, and it appears not to be contended to the contrary.

Next, we are referred to Commissioner v. Clarion Oil Co., 80 U.S.App.D.C. 41, 148 F.2d 671, certiorari denied, 1945, 325 U.S. 881, 65 S.Ct. 1575, 89 L.Ed. 1997, and a line of cases following it, Birmingham v. Loetscher Co., 8 Cir., 1951, 188 F.2d 78; Aramo-Stiftung v. Com'r, 2 Cir., 1949, 172 F.2d 896; and Wm. J. Lemp Brewing Co. v. Com'r, 1952, 18 T.C. 586, holding that the provisions of former § 356, I.R.C., now § 505(a)(1), I.R.C., 26 U.S.C.A. § 505, permitting the deduction of excess profits taxes "paid or accrued during the taxable year" in computing the surtax upon the undistributed net income of personal holding companies under § 500, I.R.C., 26 U.S.C.A. § 500, gives a taxpayer, whether cash or accrual, the option of taking this deduction on either basis. The ground of these decisions, as exemplified by Clarion, is that the provisions of § 48(c) in Chapter 1 of the Internal Revenue Code defining "paid or accrued" in terms of a taxpayer's method of reporting for the purpose of computing *net income* under that Chapter, have no application to the meaning of § 505(a) (1) permitting deduction of excess profits taxes for the purpose of computing the *undistributed income* tax on personal holding companies under Chapter 2. "But, obviously, this defini-

tion [48(c)] was intended to apply to the method of computing *net income,* and has no reference or relevancy to the subject matter of what, for the purposes of the newly added provision in relation to personal holding companies, is taxable as *undistributed* income." Clarion, 148 F.2d at page 675. Stated otherwise, Chapter 2 contains no provisions comparable to § 48(c) and § 43 of Chapter 1 defining the phrase "paid or accrued."

The Clarion and the other cases cited are inapplicable to the one before us. Here the meaning of "paid or accrued" in § 122(d) (6) is directly involved in the computation of *net income,* for § 23(s) allows as a deduction in "computing net income" under § 23 "the net operating loss deduction computed under section 122." In addition, to the extent that the meaning of "paid or accrued" is involved in the computation of the net operating loss itself by application of the § 122(d) (6) deduction, § 43 specifically gives it the same meaning as § 48(c) requires in connection with the computation of net income.

The third contention which the taxpayer presses upon us is that to construe § 122(d) (6) as we do discriminates against the accrual taxpayer. The argument is that in the nature of things it is usually impossible for a taxpayer to incur in the same year both an excess profits tax liability and a net operating loss. Therefore, it is said, an *accrual* taxpayer in most cases will be unable to get the benefit of the § 122(d) (6) adjustment in calculating his net income, while a *cash* taxpayer normally will. Take this hypothetical situation as illustrative of the taxpayer's point. A corporation had high profit years in 1942 and 1943 and incurred a $1,000,000 excess profits tax liability in the latter year, which it paid in 1944. In 1944 it had a net operating loss of $500,000, without regard to any § 122(d) (6) adjustment. If an *accrual* taxpayer, the corporation would not be able to add its excess profits taxes for 1943 to its net operating loss for 1944; if a *cash* taxpayer, it would; and this in

turn would mean that the cash taxpayer's net operating loss "carry-back" to 1942 and 1943 under § 122(b) (1) would be increased by $1,000,000, whereas the accrual taxpayer's "carry-back" would remain at $500,000.

We may conceive of situations where the accrual taxpayer is not put at this disadvantage with the cash taxpayer. One such is a situation where, as in the case of this taxpayer's 1943 excess profits taxes, accrual of the excess profits tax liability has been postponed because of a dispute concerning it, and the time of payment and accrual therefore coincide. See Robert Reis & Co. v. Com'r, 1953, 20 T.C. 294. Nevertheless, we would not be candid if we failed to recognize the force of what the taxpayer argues here. But however sympathetic one may be to this predicament of an accrual taxpayer—a phenomenon by no means unique under the tax laws—we would not be justified in ignoring the plain mandate of the statute.

Finally, on this point the taxpayer gives us the decision of the Court of Claims in Olympic Radio & Television, Inc. v. United States, 1952, 108 F.Supp. 109, 124 Ct.Cl. 33, re-hearing denied 1953, 110 F.Supp. 600, 124 Ct.Cl. 33, which squarely upholds the position of the taxpayer as to the meaning of "paid or accrued" in § 122(d) (6). We have given careful and respectful consideration to the two opinions of the majority in that case, which were based largely on the same considerations urged upon us by the taxpayer here, and find ourselves unable to agree with the Court of Claims.

4. *1946 Net Operating Loss "Carry-Back"*

Now we come to the issue involving the "carry-back" of the 1946 net operating loss to 1944 and 1945. As previously noted, § 122(b) (1) requires that such loss be applied first to the year 1944 and the excess, if any, to 1945. That excess is the amount by which the 1946 operating loss exceeds the income for 1944 "computed (A) with the exceptions, additions, and limitations provided in subsection (d) (1), (2), (4), and (6) [of § 122] and (B) by determining the net operating loss *deduction* for such second preceding taxable year [1944] without regard to such [1946] net operating loss." § 122(b) (1) and § 122(c).

In terms of the present case, the situation is this: The taxpayer's 1944 income, as to which there is no dispute, was $584,866.81, *without regard* to any § 122 (d) (6) adjustment or the 1946 net operating loss deduction under § 23(s). There was no net operating loss for 1944. The net operating loss for 1946, as determined by the Commissioner, was $164,326.38, and we have already disposed of the contention that it should have been increased by $861,118.04, the amount of the excess profits taxes paid by the taxpayer in 1946 in respect of 1945.

The taxpayer contends that in computing the amount of the 1946 net operating loss ($164,326.38) which is to be carried back to 1945, there should first be offset against 1944 net income ($584,866.81) either (a) the sum of $759,916.50, being the amount of the 1943 excess profits taxes reflected in the taxpayer's return for that year and *paid* by it in 1944, or (b) the sum of $625,561.59, being the amount of the 1944 excess profits taxes as reflected in the taxpayer's return for 1944, and which it claims *accrued* in 1944. Since under (a) the 1943 excess profits taxes *paid* in 1944 ($759,916.50) exceeded by $175,049.69 the unadjusted net income for 1944 ($584,866.81) and under (b) the 1944 excess profits taxes *accrued* for that year ($625,561.59) exceeded by $40,694.78 such net income for 1944 ($584,866.81), the taxpayer claims that the entire 1946 net operating loss ($164,326.38) constitutes a "carry-back" to 1945. We cannot agree.

What we have already held as to the meaning of "paid or accrued" in § 122 (d) (6) in connection with the computation of the 1946 net operating loss equally applies to the § 122(d) (6) adjustment to 1944 net income, and disposes of the

contention that for this purpose the taxpayer was entitled to deduct from such income the 1943 excess profits taxes *paid* in 1944.

The other contention must also fail. The excess profits taxes ultimately found by the Commissioner to be due in respect of the year 1944 were $280,540.33, and not $625,561.59, as originally reported in the taxpayer's 1944 return, and we think it was this figure rather than the uncorrected figure which represented the measure of the § 122(d) (6) adjustment to 1944 net income. Section 122(d) (6) allows the deduction of "the amount" of excess profits taxes "imposed" and (in the case of an accrual taxpayer) "accrued within the taxable year". The tax which was "imposed" for 1944 was $280,540.33, and that in our opinion was "the amount" of the tax which "accrued" in 1944 for purposes of this adjustment. True, it has been held that when all the events necessary to determine the amount of a tax have occurred within a taxable year, the tax as reported in that year constitutes the tax "accrued" despite the occurrence of later events which change the amount of the tax ultimately found due. See United States v. Detroit-Moulding Corp., D.C.E.D.Mich.1944, 56 F.Supp. 754. But if we are to follow this view we should also take the *income* as originally reported in the 1944 return, *viz.*, $827,852.99 instead of $584,866.81 as finally determined by the Commissioner. What the taxpayer is seeking to do is to have the benefit of both the *smaller* 1944 income as finally determined ($584,866.81) and the *larger* excess profits tax ($625,561.59), based upon the income as originally reported. The taxpayer must match either the *returned* income ($827,852.99) against the *returned* excess profits tax based thereon ($625,561.59), or the *determined* income ($584,866.81) against the *determined* excess profits tax ($280,540.33). It cannot have it both ways at the same time by matching *determined* income against *returned* excess profits taxes. And we think it is *determined* income and excess profits taxes

that represent the proper § 122(d) (6) adjustment, since the manifest purpose of the "carry-back" and "carry-over" provisions of the statute, § 122(b) (1), (2) is that the incidence of this kind of taxation upon a business enterprise shall in effect be looked at from the vantage point of a five year period, that is the current taxable year plus two "carry-back" and two "carry-over" taxable years.

In light of this wearisome discussion, we think that the correct situation as to the 1946 "carry-back" was this: The taxpayer's 1944 net income, before the § 122(d) (6) and § 23(s) adjustments, was $584,866.81. The excess profits taxes which accrued for 1944 were $280,540.33. After the § 122(d) (6) adjustment ($584,866.81 *minus* $280,540.33), the balance of 1944 income was $304,326.48. Since this was greater than the net operating loss for 1946 ($164,326.38), this resulted, as the Commissioner and Tax Court determined, in there being nothing left from the 1946 net operating loss to "carry back" to 1945. It likewise resulted in there being taxable income for 1944.

### 5. *Computation of 1945 Excess Profits Tax Deficiency*

In computing the excess profits tax deficiency for 1945, the Commissioner apparently gave no credit for the $108,437.36 remitted by the taxpayer on September 29, 1947. The taxpayer asserts this was an amount "collected without assessment" which under § 271(a) (1) (B) the Commissioner was required to take into account in computing the 1945 deficiency. See McConkey v. Com'r, 4 Cir., 1952, 199 F.2d 892, certiorari denied 1953, 345 U.S. 924, 73 S.Ct. 782, 97 L.Ed. 1355; Bendheim v. Com'r, 2 Cir., 214 F.2d 26.

For the reasons already discussed, we think that this would be so only if the remittance were made under circumstances which would constitute it a satisfaction of a tax liability in whole or in part. In the McConkey and Bendheim

**528**

cases, supra, the taxpayers made remittances similar to that now under consideration. Each of those remittances was deposited in the Collector's "Suspense Account" and stood, under the authority of the Rosenman case, as "a cash bond for the payment of taxes thereafter found to be due," or, in effect, as a continuing offer by the taxpayer to the Collector. that he apply the amount to the discharge of a tax liability in whole or in part. And in each of those cases the Collector, after these deposits with their implicit offers had been made, stated a proposed deficiency not in excess of the deposit, thereby indicating unequivocally an acceptance of the taxpayer's offer. Accordingly, the amounts became "collected without assessment" within the meaning of § 271(a) (1) (B), and the taxpayer's sole remedy remaining was an independent suit for refund.

Here, however, the Collector did not accept, explicitly or implicitly, the taxpayer's remittance as a discharge of its tax liability, in whole or in part, nor could he be forced to do so while that liability was still in dispute. Indeed, no deficiency had yet been proposed in 1947. But in 1948 the Revenue Agent proposed a deficiency in excess of the taxpayer's remittance, as to which the Commissioner issued his deficiency notice on February 16, 1950, and which the taxpayer was free to, and did, contest; and certainly the Commissioner for his part was not required to circumscribe his position in the ensuing litigation in the Tax Court by making application of such remittance to the asserted tax liability. In other words, until the Commissioner, with unequivocal authority of the taxpayer, applied or was required to apply the $108,437.36 remittance as a satisfaction, in whole or in part, of the asserted tax liability, this remittance did not constitute an amount "collected without assessment" within the meaning of § 271, but continued as no more than a deposit voluntarily made by the taxpayer.

Affirmed.