In the Matter of **STONEWALL PRECISION CORP., Bankrupt.**

United States District Court
S. D. New York.
May 5, 1961.

Morton S. Robson, U. S. Atty., for the Southern Dist. of New York, New York City, for the United States; Myron J. Wiess, Asst. U. S. Atty., New York City, of counsel.

Siegel & Brownstein, New York City, for trustee; Benjamin Brownstein and Harold Young, New York City, of counsel.

PALMIERI, District Judge.

This is a petition brought by the United States to review an order of a Referee in Bankruptcy reducing its claim for taxes. The Referee sustained the objections of the Trustee to portions of the proof of claim filed by the Government detailing deficiencies in income tax alleged to be due from Swiss Radium and Dial Painting Co. (Swiss Radium), a corporation which merged with the bankrupt. The portions of the claim to which the Trustee objected stem from the Internal Revenue Service disallowance of deductions for interest accruals [1] of $18,-

---

1. See Int.Rev.Code of 1939, § 23(b) (deduction allowed for interest paid or accrued within the taxable year), § 43 (deduction by accrual basis taxpayer to be taken in year in which paid or accrued), 26 U.S.C.A. §§ 23(b), 43.

696.78 for 1946, $6,478.12 for 1947, and $5,552.68 for 1948, by reason of which deficiencies in income taxes of $11,817.29 for 1946, $3,946.78 for 1947, and $2,-349.13 for 1948 were asserted.

In November, 1946, when the contested interest accruals were first made on the books of Swiss Radium, that corporation was under investigation for criminal fraud in connection with its income tax returns for the years 1935–1942. On November 14, 1946, the attorneys for Swiss Radium and three of its principals addressed a letter to the Attorney General [2] with respect to reports received "from the Bureau of Internal Revenue on or about April 6, 1945 setting forth proposed tax deficiencies and penalties" and the protests of those reports at several conferences with the Bureau. Counsel enclosed in this letter a check to the order of the Commissioner of Internal Revenue for $111,241.47, the full amount of the additional taxes and penalties asserted in the reports of proposed deficiencies together with interest thereon. Counsel recited that the check was intended as an "offer in full settlement of all liabilities, both civil and criminal," and that the remittance was submitted "without prejudice, and conditionally upon [the Attorney General's] agreeing to a final closing of all matters in controversy as to the respective tax years." The remittance was not accepted by the Government and was returned to the taxpayer. Swiss Radium then posted to an accrued liability account the proposed deficiencies and penalties and the interest accruals which are the subject of this petition for review.[3]

In his opinion, the Referee stated that "one may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and that applies to a tax which is denied and payment whereof is contested." Neither side disputes the accuracy of the Referee's declaration of the controlling legal principle. See Dixie Pine Products Co. v. C. I. R., 1944, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270; Security Flour Mills Co. v. C. I. R., 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725; National Biscuit Co. v. United States, 1957, 156 F.Supp. 916, 140 Ct.Cl. 443. The appropriate application of that principle to the agreed facts is the subject of the challenge now made by the Government.

On the basis of counsel's letter to the Attorney General, the Referee concluded that, in November 1946 and thereafter, Swiss Radium was no longer contesting either its liability for or the amount of the Government's tax claim and was therefore entitled to accrue interest and to deduct such accruals in computing its net taxable income. The Referee discounted the conditional language in which the "offer of settlement" was phrased as a "plaintive plea for avoidance of criminal action." In its challenge to the Referee's conclusion, the Government maintains that the agreed facts demonstrate the absence of any final determination in 1946, 1947, or 1948 as to Swiss Radium's 1935–1942 tax indebtedness. As the Government views the facts, the interest accruals were without justification because there had been no termination of the taxpayer's contest by reason of the letter to the Attorney General either on the fact of liability or the amount thereof.

A taxpayer need not institute legal proceedings in order to "contest" its liability for a tax. See Gunderson Bros. Engineering Corp., 1951, 16 T.C. 118. Protests to the Service, such as those made by Swiss Radium prior to the November 1946 letter, are sufficient. See Note, "Accrual of Tax Deficiencies and Recoveries," 58 Colum.L.Rev. 372, 378 (1958). This much is conceded by the

2. A copy of this letter is attached hereto as an appendix.

3. The rejected remittance included $61,-331.53 as additional taxes, $31,213.16 as penalties at the 50% rate, and $18,696.78 as interest to November 15, 1946. The tax claims against which the remittance was submitted were compromised on or about November 30, 1954 for the total sum of $62,416.17, including $41,480.31 for deficiencies and $20,935.68 for fraud penalties with no provision for interest.

Trustee. The problem here, therefore, is whether resolution of an existing contest occurred when Swiss Radium, through counsel, directed a letter and remittance to the Attorney General and established an accrued liability on its books.

■ The accrual of interest on the company's books, as an internal and possibly self-serving act of the corporation, cannot be determinative. If a taxpayer wishes to terminate a contest by final acquiescence in the Government's demand for increased taxes, it is reasonable to require that he so notify the appropriate Government agency.[4] Whatever effect Swiss Radium's book entries may have had on its internal affairs, such entries did not amount to a manifestation of acquiescence communicated to the agency charged with collection of the tax. Therefore, the relevant inquiry should center on the question whether the November 1946 letter and remittance constituted adequate notice to the Government that the period of taxpayer protest was at an end. See 58 Colum.L.Rev., supra at 380-81.

The Referee observed that the letter "admitted liability and specified the amounts and years of unreported income." But, in my view, there is a critical distinction between an acknowledgment of unreported income and an acknowledgment of liability for tax on such income. Throughout the letter, the attorneys for Swiss Radium made it perfectly plain that they and the taxpayer believed the 50% fraud penalties to be unwarranted because of the absence of the requisite intent. For example, it was stated at the outset:

"Taxpayers contended and still maintain that the proposed additional taxes are arbitrary and excessive, and the penalties are not justifiable."

and, on the final page, this conclusion appeared:

"These facts indicated that Swiss did not intend to evade or defeat its true income tax liability * * *."

Cf. Edwards v. United States, 5 Cir., 1961, 286 F.2d 681, 683 (distinction between admission of facts and admission of intent). The tenor of the letter, particularly the first two paragraphs, is that counsel were seeking to settle all of the taxpayer's liabilities without withdrawing pro tanto their protests and possible defenses thereto. Indeed, counsel adverted to the possibility of a claim with respect to business deductions that might have been taken as offsets had additional income been reported. Appendix, p. 3; cf. Bull v. United States, 1935, 295 U.S. 247, 261, 55 S.Ct. 695, 79 L.Ed. 1421. In short, the communication directed to the Government was entirely consistent with an intent on the part of the taxpayer not to terminate the contest unless it received the requested quid pro quo. However, even assuming that Swiss Radium in fact intended to concede liability for the amount sought by the Government whether or not the risk of prosecution could be avoided, the expressions contained in the November 14, 1946 letter were inadequate to put the Government on notice that a protesting taxpayer was relinquishing that role and was proposing a final and unconditional recognition of liability. See Lewyt Corp. v. C. I. R., 2 Cir., 1954, 215 F.2d 518, 522, reversed in part on other grounds, 1955, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029; cf. James F. Keith, 1961, 35 T.C. No. 117. But cf. Landers, Frary & Clark v. United States, 1957, 149 F.Supp. 202, 204-205, 37 Ct.Cl. 870.

Because I believe that the facts before me compel a distinction between what the taxpayer admitted without reservation and what it declined to concede to

---

4. See Lewyt Corp. v. C. I. R., 2 Cir., 1954, 215 F.2d 518, 522, reversed in part on other grounds, 1955, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029: "The taxpayer was not entitled to have these remittances treated as a satisfaction of its tax liabilities * * * and at the same time continue to contest such liabilities, or at best leave the Collector with an ambiguous situation on his hands."

the Government without receiving in exchange assurances of a final settlement of all criminal and civil tax liabilities, I must reverse the Referee's determination and overrule the objections of the Trustee to the Government's proof of claim.

Petition granted.

So ordered.

## Appendix.

The Attorney General
U. S. Dept. of Justice
Washington 25, D. C.
Sir:

Att: DWM:MR:–5–51–5143

Re: Swiss Radium & Dial Painting Co., Inc.

Jacob Schonholtz
David Megar
Maurice A. Popiel

---

### Offer of Settlement.

In accordance with the discussion of the above-named cases at your office on August 20, 1946, we submit the following offer in full settlement of all liabilities, both civil and criminal. Of course it is understood that this offer and the accompanying remittances are submitted without prejudice, and conditionally upon your agreeing to a final closing of all matters in controversy as to the respective tax years.

The taxpayers have heretofore received reports from the Bureau of Internal Revenue, on or about April 6, 1945, setting forth proposed tax deficiencies and penalties. Taxpayers protested these findings at several conferences with Bureau of Internal Revenue representatives, in 1945 and 1946, both in New York and in Washington, D. C., but without reaching any agreement. Taxpayers contended, and still maintain, that the proposed additional taxes are arbitrary and excessive, and the penalties are not justifiable. Nevertheless, for the purpose of obtaining a final settlement of all issues, the taxpayers tender herewith checks to the order of the Collector of Internal Revenue in the amount of the full additional taxes, penalties and interest to November 15, 1946, as asserted by the Bureau of Internal Revenue.

The amounts of the checks referred to, have been computed as follows:

Swiss Radium & Dial Painting Co., Inc.
1935–1942 incl.

| | |
|---|---|
| Additional taxes | $ 61,331.53 |
| Penalties @ 50% | 31,213.16 |
| Interest to Nov. 15, 1946 @ 6% | 18,696.78 |
| Total | $111,241.47 |

Individual taxpayers, 1935–1943 incl.

| | David Megar | Maurice A. Popiel | Jacob Schonholtz |
|---|---|---|---|
| Additional taxes | $14,367.39 | $13,085.76 | $13,665.54 |
| Penalties @ 50% | 5,856.05 | 5,266.02 | 5,552.43 |
| Interest to Nov. 15, 1946 @ 6% | 3,989.39 | 3,565.76 | 3,757.10 |
| Totals | $24,212.83 | $21,917.54 | $22,975.07 |

While the payment of penalties of nearly $48,000 is a severe financial burden to the taxpayers, nevertheless they are satisfied to make voluntary payment, as set forth herein, in order to obtain your approval for closing this matter on a basis that is otherwise fair and reasonable to all concerned, in view of the following stated facts.

As you know, the tax deficiencies arise chiefly from the failure of the corporation to record as income the proceeds of sales of scrap metals. During the years 1940, 1941 and 1942, which are within the 6 year statute of limitations on prosecutions, and in the following year, 1943, which was accepted without change after examination, the scrap sales transactions amounting to a total of $191,059.77 are analyzed as follows:

| Year | Value of Scrap Sent to Refiners | Metal | Receipts | |
|---|---|---|---|---|
| | | | Cash Reported | Not Reported |
| 1940 | 39,404.37 | 701.00 | 10,820.80 | 27,882.57 |
| 1941 | 46,553.90 | 1,452.64 | 17,284.23 | 27,817.03 |
| 1942 | 29,202.60 | 4,171.99 | 17,950.40 | 7,080.21 |
| 1943 | 75,898.90 | 15,345.12 | 60,553.78 | –0– |
| Totals | 191,059.77 | 21,670.75 | 106,609.21 | 62,779.81 |

These transactions arise from the process of manufacturing dials for watches and watch cases, in which the corporation and its officers have been engaged since 1926.

The process of manufacturing watch cases from precious metals, requires stamping as a result of which there are certain metal scraps. That scrap metal is saved and shipped to refiners, who extract the precious metal from the scrap metal. The refiner either pays the manufacturer for the metal recovered less charges, or returns the recovered metal and is paid for services.

This case does not involve black market operations.

The figures shown above raise several points. First, although Swiss sold scrap valued at $191,059.77 it did report $128,-279.96 as income, and is alleged to have failed to report $62,779.81. Thus over 67% of all scrap sold was reported. If the officers of Swiss were wilful tax evaders, their natural tendency would have been against reporting any part of the scrap sales, since it was just as easy to withhold all the scrap sales as it was to withhold only a part; and the entire source of this income would have been thereby concealed.

Second, it is apparent from these figures, that there occurred in the activities of the company, a course of conduct, which the bare allegations of the Bureau of Internal Revenue do not reveal.

The officers of the corporation inform us that they maintained a uniform price for its products to all buyers, but there were occasions when certain large quantity buyers insisted on lower prices, or rebates. In order to meet this business situation, the customer was billed at the uniform price, but when his remittance was received for this lesser sum at which actually sold, the difference was made up and deposited as income in the taxpayer's business bank account, to the customer's credit, from the cash received from scrap sales. In view of the passage of time since 1941, it is practically impossible to reconstruct any of these facts.

Also, it was necessary to do considerable entertaining which it was deemed unwise to detail on the company's books. The scrap sales cash was used for that purpose.

The corporate officers advise that these funds were not used for their personal benefit but for the benefit of the corporation in the promotion of its sales and conduct of its business, and it is our opinion that if such expenses had been properly recorded they were allowable income tax deductions which would offset the alleged unreported scrap sales.

Third, it is evident from the figures, that the taxpayer's explanation as to its use of the scrap sales funds is true, based on a knowledge of business practice and the economic cycle. It is a fact that from 1940 through 1943 and later, the market for all types of goods became firmer. A buyer's market became a seller's market until many essential commodities were unobtainable.

The business cycle affected the corporation as it did all other manufacturers. In 1940 and 1941, it was in a competitive market where sellers had to exert strenuous efforts to obtain business. In 1940 and 1941, Swiss had to use approximately $27,000 in each year out of scrap sales funds to promote its business. In 1942 as the buyers market became a sellers market only $7,000 of scrap sales money was used, and in 1943 and thereafter, when goods were unobtainable and it was a pure sellers market it became unnecessary to promote business, and no scrap sales money was used. It was all reported.

These facts indicated that Swiss did not intend to evade or defeat its true income tax liability, but only withheld such scrap sales funds as it needed for its business conduct.

During 1942 and 1943, taxpayers devoted the major part of its facilities towards the war effort and manufactured shells for bullets. It has made a material contribution to the war effort and has paid during the current years, large tax revenues. It is a sound and successful business with a good future, and as such will be a substantial taxpayer. It employs in excess of three hundred people who are highly skilled in their specialized work, under the supervision of the experienced officers who are always actively engaged in the business.

Your favorable consideration is solicited, as it is earnestly believed that the proposed settlement will be to the best interests of all concerned, and will fully meet the demands of justice in this case.

May we look forward to an early reply concerning your acceptance of this proposal.

Respectfully submitted,