Littleton, Judge,
delivered-the opinion of the court:
The plaintiff sues to recover income taxes alleged to have been overpaid for the calendar years 1938, 1939 and 1941. The plaintiff kept its books and filed its income tax returns upon the accrual basis. The primary issue presented in these three cases is what year is the proper year for deduction of contested real estate taxes where payment of the full amount of the tax assessed was made to the City and State of New York within the taxable years, but the correct amount of the liability was not settled until a subsequent taxable year.
■ The facts, which are fully set forth in the findings, are summarized for the purposes of this decision as follows
The plaintiff is a public utility corporation engaged in the manufacture, distribution and sale of electrical energy and gas. During the years involved the plaintiff owned many hundreds of parcels of real estate in the City of New York which were subject to a tax under the laws of the State and City of New York on real estate owned by corporations.
Each parcel of real estate was appraised by the City Tax Commission and its value was placed upon a tentative assessment roll. Administrative proceedings were available to plaintiff to correct erroneous valuations. An application for correction of assessment (sometimes called a protest) had to be filed on forms supplied by the Tax Commission and all pertinent questions thereon had to be answered. One of the questions in the protest which had to be answered was “What do you consider was the full value of the property on January 25 of this year?” Failure to answer this question was fatal to the application. Judicial review was available by way of a certiorari proceeding, an exclusive remedy, only upon exhaustion of the administrative procedure.
In all cases, except where illegality of the tax in its entirety was alleged rather than to its form or method, the petition for judicial review had to set forth, as did the plaintiff’s *379 original protest, what the full value of the property was claimed to be. Thus in complying with the requirement of the law of New York, and alleging both in the protest and in the petition to the court the claimed full value of the property involved, a taxpayer admitted liability for real estate tax thereon in a certain and definite amount, namely, the claimed value of the property multiplied by the established tax rate.
■ The institution or pendency of litigation for the correction of an assessment did not postpone the dates the bills for the real estate taxes became due and payable. Failure to pay the tax bills when due subjected the property involved to a tax lien which had the effect of a judgment lien which could have been foreclosed and the property sold. In addition, a penalty of interest at 7 percent per aimum was incurred. There was no provision in the New York law for suspending or removing the tax lien, whether by injunction, bond or otherwise, other than by payment of the taxes thereon, as billed. Thus an aggrieved property owner had to first pay the real estate taxes and then seek to rectify the error by the exclusive remedy or run the risk, in addition to incurring 7 percent interest, of having the tax lien foreclosed and the property sold.
The parties have agreed that the facts are accurately reflected in the following simplified example, for the taxable year 1939, which is applicable to all the years involved. For the year 1939 plaintiff was notified, on January 25,1939, of a tentative assessment for real estate taxes in the amount of $100. Within the statutory period and by March 15, 1939, plaintiff, based upon the best judgment of its officers, duly filed a bona fide protest admitting liability in the amount of $85, and petitioning .for an administrative reduction of the tentative assessment in the amount of $100 by the amount of $15. After a hearing duly held, and on or about May 25, 1939, final assessment was made in the amount of $100. Thereafter, on or about October 1, 1939, under protest and for the stated purpose of avoiding liens, seizures, levies, penalties, interest, etc., and reserving all rights, plaintiff made payment of the assessed tax in the amount of $100. Within the statutory period, on October 25,1939, certiorari proceed- *380 mgs were instituted admitting liability in the amount of, and denying liability in excess of, $85. On August 21, 1941, the Supreme Court of the State of New York entered its order in the certiorari proceedings fixing the tax liability at $95. In October 1941, plaintiff received a refund of the excess payment in the amount of $5.
The plaintiff accrued on its books and deducted on its Federal tax returns for 1939 the full $100. Upon audit the Commissioner of Internal Revenue allowed only $95 for that year, but included the $5 refund received in 1941, as income for 1941. The defendant now concedes that if only a $95 deduction is allowed for 1939, then the $5 refund should not be included as income in 1941. Timely claims for refunds based upon, among other things, an understatement of depreciation and amortization for 1938,1939, and 1941 were made and partially allowed by the Commissioner. However, the Commissioner offset these refunds by adjustments made because of his treatment of the real estate tax involved in this case.
The defendant raises pro forma the question of the statute of limitations in cases Nos. 49654 and 49655. It states that since plaintiff filed its claims for refund for 1938 and 1939, on March 10, 1942, and March 11, 1943, respectively, plaintiff could have sued within six months thereafter and therefore its petitions in those two cases, filed in the Court of Claims on May 25,1950, are barred by 28 U. S. C. § 2501. This question has been decided by our decision in Detroit Trust Company v. United States, 131 C. Cls. 223, where we held that § 3772 of the Internal Revenue Code of 1939, as amended, was the governing statute of limitations and that the six-year statute of limitations contained in 28 U. S. C. § 2501 was not applicable. The petitions in all three of plaintiff’s cases were therefore timely filed.
The plaintiff contends that it should be allowed deductions in 1938, 1939, and 1941 of the amounts of real estate taxes admitted in those years to have been due ($85); deductions in 1941 upon termination of the litigation of the additional amounts of taxes determined to be due over and above the amounts previously admitted ($10); and exclusion from 1941 income of amounts of excess payments of real estate taxes in the prior years which were refunded in 1941 ($5). The de *381 fendant’s present position is that plaintiff is entitled to deductions in 1938, 1939, and 1941 of amounts of real estate taxes paid in those years ($100), and the inclusion in 1941 income of the amounts of excess payments of real estate taxes for those years which were refunded in 1941 ($5).
The pertinent provisions of the applicable sections of the Internal Revenue Code (26 U. S. C.) are set forth below.[1]
The plaintiff’s argument is twofold. First, it argues that in order to accrue a deductible item, admission or absence of denial of liability is necessary, relying on United States v. Anderson, 269 U. S. 422; Dixie Pine Products Co. v. Commissioner, 320 U. S. 516, and Security Flow Mills Co. v. Commissioner, 321 U. S. 281. Second, it argues that generally accepted accounting principles require that the disputed portion of a tax liability, although paid, should not be accrued until liability is established. The plaintiff, citing United States v. Olympic Radio & Television, Inc., 349 U. S. 232, and Lewyt Corporation v. Commissioner, 349 U. S. 237, contends that these recognized accounting principles are highly persuasive on questions of accruals.
The defendant contends that our decision in Chestnut Securities Co. v. United States, 104 C. Cls. 489, is controlling.
In our opinion the rule stated in the Chestnut Securities case is applicable in the instant case. In that case the taxpayer, on the accrual basis, paid 1936, 1937 and 1938 state taxes after a District Court decision in 1940. The Circuit Court affirmed and the Supreme Court denied certiorari in 1942. The taxpayer contended in a suit in this court that the *382 state taxes were deductible in 1940 when paid and the defendant contended that they were deductible in 1942 when the litigation was finally decided. We held they were deductible in 1940 because payment discharged the liability and accrued the taxes in that year. The Commissioner of Internal Revenue has adopted and is following this rule. C. B. 1947-2, G. C. M. 25298, pp. 39, 43, 44. The plaintiff asserts that the case is either distinguishable or erroneous.
It is settled that a taxpayer may not accrue an expense when he is denying liability and refusing and contesting its payment. Dixie Pine Products Co. v. Commissioner, supra; Security Flour Mills Co. v. Commissioner, sufra. The plaintiff argues from this principle that there must therefore be an admission or absence of denial of liability before an item may be accrued and that the payment of the liability within the taxable year has no effect on its accrual since payment was made under protest and litigation was immediately started to obtain a repayment. This is not necessarily true.
Under the accrual system of accounting revenues are accrued as nearly as practicable to the period earned and expenses, which include taxes, are accrued in the period and against the revenues they helped to produce. Our system of taxation requires a determination of taxes on an annual basis predicated on the economic events which occurred and were in existence during a taxable year. United States v. Anderson, supra; Burnet v. Sanford & Brooks Co., 282 U. S. 359; Security Flour Mills Co. v. Commissioner, supra. The Supreme Court stated that:
* * * Only by such a system is it practicable to produce a regular flow of income and apply methods of accounting, assessment, and collection capable of practical operation. * * * [Burnet v. Sanford & Brooks Co., supra, at p. 365; Security Flour Mills Co. v. Commissioner, supra, at p. 286.]
* * * The uniform result has been denial both to Government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year m which the right to receive, or the obligation to pay, has become final and definite in. amount. * * * [Security Flour Mills Co. v. Commissioner, supra, at pp. 286, 287.]
*383 When expenses are incurred and therefore should be accrued under the accrual method of accounting for tax purposes, is determined from a practical, not a technical legal test. Lucas v. American Code Co., 280 U. S. 445, 449.
Insofar as the plaintiff in the instant case was concerned it incurred an obligation in the amount of $100 in 1939, since it, as a practical matter, had to and did discharge the full amount of the real estate taxes assessed. Its obligation to pay, insofar as the taxable year 1939 was concerned, had become final and definite in amount when it paid the full amount of the real estate tax for 1939 assessed in that year. Viewing the situation at the end of that taxable year, as we must, we find that the plaintiff incurred and paid a $100 obligation, although it was under protest and with the bona fide expectation that a part of the payment would be subsequently refunded.
The plaintiff actually accrued on its books and deducted in its tax returns the full $100 amount. We think this was proper because the plaintiff incurred an expense in the amount of $100 in that year. Had the plaintiff failed to obtain a repayment of its real estate taxes for 1939, its returns would have correctly reflected its income for that year under the accrual method. There is no compelling reason why a sustained expense should be postponed until settlement of the question of repayment. Since the plaintiff was successful and obtained a repayment of $5, under our annual accounting concept this amount should be included as income in 1941, the year plaintiff’s right to the repayment became final.
The underlying reason for the rule in the Dixie Pine Products and the /Security Flour Mill cases of refusing a deduction where the taxpayer has not paid the expense and is contesting it, is because the expense may never be incurred. In the instant case the expense had been incurred and actually paid within the taxable year and is therefore deductible in that year.
What we have said does not mean that the mere payment of an item accrues that item, but rather we hold that payment of an item which is otherwise accruable in the taxable year accrues the item even though payment is made under protest and even though litigation is started within the taxable year *384 to obtain repayment. Therefore, the plaintiff’s prepayment in 1941 of part of its 1942 taxes does not accrue those taxes in 1941.
The plaintiff’s argument based upon the fact that accepted accounting principles require that the disputed portion of the tax liability, although paid, should not be accrued until settlement of the dispute, lacks sufficient persuasiveness, under the facts presented in this case, because such principles represent a refinement in ascertaining net income that would be impractical and, in our opinion, infeasible in the administration of the revenue laws.
In view of the complex computations involved in these three cases, the parties have agreed upon computations of the amounts of income taxes overpaid or underpaid by the plaintiff dependent upon which of the alternatives the court finds to be correct. These computations are set forth in finding 47. We hold that finding 47 (C) sets forth the correct deductions and inclusions. Finding 47 (C) provides for the “allowance as deductions in 1988,1939 and 1941 of amounts of real estate taxes paid in those years ($100.00); and inclusion in 1941 income of the amounts of excess payments of real estate taxes for said years that were refunded in 1941 ($5.00).” Translated into dollar amounts in the individual cases, according to this finding, the plaintiff is entitled to recover $128,329.55 in case No. 49654; $105,305.58 in case No. 49655, and nothing in case No. 50432.
Judgment will be entered for plaintiff in case No. 49654 in the amount of $128,329.55, and in case No. 49655 in the amount of $105,305.58, with interest thereon, respectively, as provided by law. The petition in case No. 50432 is dismissed.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Richard FI. Akers, makes the following findings of fact:
1. The plaintiff is a public utility corporation duly organized and existing under and by virtue of the laws of the *385 State of New York, with its principal office located at 4 Irving Place, Borongb of Manhattan, City and County of New York, in the State of New York, and is engaged in the manufacture, distribution and sale of electrical energy and gas.
2. The plaintiff sues to recover income taxes alleged to have been overpaid for the calendar years 1938, 1939 and 1941. At all times during those years, the plaintiff kept its books and filed its income tax returns upon an accrual accounting basis.
3. Certain formal facts with respect to the years involved herein are as follows: '

4.The refund claims filed for the years 1938, 1939 and 1941 were based upon the alleged understatement of several deductions, among which were the deductions for depreciation and amortization. In a consideration of those claims, increased deductions for depreciation and amortization were allowed by the Commissioner of Internal Revenue for the years 1938, 1939 and 1941, but they were offset by other adjustments made by the Commissioner, chief of which were (1) the disallowance of that part of the real estate tax deductions taken in 1938 and 1939, which were refunded to the plaintiff in 1941, and (2) the inclusion of those refunded real estate taxes (including a refund of part of the real estate taxes paid in 1940) in the plaintiff’s gross income for 1941. In addition thereto, the Commissioner disallowed the plaintiff’s claim for an increase of $8,108,497.64 in its deduction for real estate taxes for 1941.
*386 The allowances and the offsetting adjustments made by the Commissioner are shown in the following tabulation:

5. During the years involved herein, the plaintiff owned many hundreds of parcels of real estate in the City of New York which were subject to a real estate of corporations tax (hereinafter referred to as real estate tax) under the laws of the State of New York and of the City of New York in general, and the New York State Tax Law, the New York City Charter and the Administrative Code of the City of New York in particular.
6. The New York City Charter, which became effective January 1, 1938, changed the operating year of the City of New York from a calendar year basis to a fiscal year basis of July 1 to the following June 30, commencing with July 1, 1939. Thereunder, each parcel of real estate, identified by section, block, lot and identification number, is appraised by the City Tax Commission as of January 25; the value so determined is placed upon a tentative assessment roll which is open for inspection from February 1 to March 15; an aggrieved property owner could then seek an administrative review to correct any claimed erroneous valuation by filing with the Tax Commission, on or before March 15, a sworn application for correction of the assessment setting forth the bases and grounds thereof, and could request an oral hearing thereon; a final determination must be made on or before* *387 May 25; and if no action is taken by then, the tentative assessment becomes final.
The assessment roll is then sent to the Comptroller of the City of New York who, between June 20 and June 25, prepares a pi’oposed budget for the ensuing fiscal year and submits it, together with the assessment roll and his estimate of revenues to be raised from real estate taxes and from other sources, to the City Council. On the basis thereof, the Council must by June 25 adopt a budget and fix a real estate tax rate which, after considering revenues from other sources and when applied to the final valuation of the assessment roll, will produce the necessary revenue to meet the operating and budgetary requirements of the City for the ensuing year.
Bills for the real estate tax on each parcel — the product of the tax rate thus established and the valuations on the final assessment roll — are then sent to each property owner and are payable in two installments, October 1 and April 1 of the fiscal year.
7. An application for correction of assessment (sometimes called a protest), referred to in finding 6, must be filed on forms supplied by the Tax Commission and all pertinent questions thereon must be answered. Objections which can be raised are (1) overvaluation, (2) inequality, or (3) illegality. Overvaluation or inequality does not invalidate the tax or the liability therefor but merely calls for correction of the amount of the tax. Where illegality is predicated upon an illegal form or method of valuation, it is another way of raising the question of overvaluation or inequality ; only where it is addressed to the validity of the tax itself does a successful challenge wipe out the tax in its entirety and all liability therefor.
8. One of the questions in the protest which must be answered is “What do you consider was the full value of the property on January 25 this year ?” A similar question was in the protest forms for earlier calendar years. Failure to answer this question is, under New York law, fatal to such application. The Tax Commission causes each protest to-be examined to ascertain whether this question is answered,, and if it is not, the protest is summarily rejected. Without answering this question, it is impossible to obtain an admin- *388 istrafcive review of any real estate assessment in New York City.
9. Similar administrative procedures existed prior to the adoption of the New York City Charter, which became effective January 1, 1938, except that the dates set for the various administrative steps to be taken in the earlier years were moved back to fit in with the calendar year, so as to afford similar time intervals for the commencement and termination of the administrative steps. The City Charter retained the year 1938 on a calendar year basis and specific provisions were made for the transition period January 1, 1939 to June 30; for example, the valuations determined for the year 1938 constituted the valuations for this interim period subject to modification for additions and retirements, and the protests filed with respect to the 1938 valuations were considered applicable to the same valuations for the interim period.
10. Under the New York law, an aggrieved property owner could not obtain a judicial review of a protested assessment without first exhausting the administrative procedure outlined. Upon failure to obtain satisfactory relief through administrative process, judicial review could then be instituted not later than October 25 (July 1 for 1938 and the first half of 1939) of the year in which the assessment becomes final.
Article 13 of the New York State Tax Law specifically provides for such judicial review (hereinafter referred to as certiorari proceeding). This is an exclusive remedy. Pursuant thereto, a verified petition to review the assessment must be submitted to an appropriate court or judge; an order thereon is issued directing the issuance of a writ of certiorari to the Tax Commission returnable on a specified date; and the issues raised upon the return date are thereafter brought to trial. In the case of properties as large as those owned by the plaintiff herein, it is virtually impossible to get a judicial determination of the issues raised within one and a ■half to two years after the cases are started.
• ■ 11. The petition must explicitly and fully set forth the basis upon which the relief is sought: if it is overvaluation, the extent of the overvaluation must be alleged; if it is inequality, the instances of such inequality and the extent thereof must be alleged; and if it is illegality, the grounds of illegality must be specified. In all cases, except where il *389 legality is addressed to the tax in its entirety rather than to its form or method, the petition must set forth, as did the original protest, what the full value of the property is claimed to be.
Under New York law, the petitioner is bound by the valuation thus alleged as the minimum value that could be found by the court. Thus, in complying with the- requirement of the law of New York, and alleging both in the protest and in the petition to the court the claimed full value of the property involved, a taxpayer admits liability for real estate tax thereon in a certain and definite amount, namely, the claimed value of the property multiplied by the established tax rate.
12. The real estate tax rate for any particular operating year does not vary or change after it is established. The budget makes provision for estimated refunds of real estate taxes resulting from reductions in assessed valuations, and if the actual refunds exceed that estimate, the tax rate for the year involved is in no way affected thereby. To meet such additional expenditure, the City would have to borrow money therefor and then provide for payment of the loan in the budget of the following year or years, but the City Council does not reopen the budget of the year involved or change the tax rate already established for that year.
13. The institution or pendency of litigation for the correction of an assessment does not postpone the dates the bills for the real estate taxes become due and payable. Notwithstanding the pendency of such litigation, failure to pay the bills when due subjects the property involved to a tax lien which has the effect of a judgment lien and which could be foreclosed and the property sold. In addition, 7 percent per annum penalty interest is incurred.
There is no provision in the New York law for suspending or removing the tax lien, whether by injunction, bond or otherwise, other than by payment of the taxes thereon, as billed. Under the New York law an aggrieved property owner must first pay the real estate taxes thereon and then seek to rectify the error by the exclusive remedy outlined in the statute, or else run the risk, in addition to incurring a 7 percent interest penalty, of having the tax lien foreclosed and the property sold.
*390 14. Immediately prior to the years involved herein, the Board of Taxes and Assessments (as the Tax Commission was then known) had departed from the nsual procedure of valuing each and every parcel of real estate and making individual assessments thereon by section, block, lot and identification number, and consolidated the assessments on the properties owned by the plaintiff into lump sum company assessments for the calendar years 1936 and 1937. These assessments were substantially in excess of the sum of the valuations theretofore assigned to the individual properties. The assessments were contested on the grounds of overvaluation and inequality and also illegality because of the lump sum company assessments.
15. For 1938 and subsequent years, the lump assessment procedure was discontinued and tentative assessments were made upon the individual parcels. The plaintiff sought administrative relief from, and review of, the valuation of its properties as they appeared on the tentative assessment rolls for the years involved herein by filing with the proper authorities timely protests and applications for correction of the assessments upon the forms supplied by the Tax Commission and in compliance with the laws and requirements of the City and State of New York. The valuations tentatively assessed, the valuations and overvaluations claimed in the protests, and the final valuations found by the Tax Commission, are as follows:
1988 1989[1] 1989/1940 [2] mourn[2]
(a) Valuation tentatively assessed.— $411,106,175 $416,635,375 $407,254,850 $403,066,500
Overvaluation claimed in protests. 116,625,300 112,042,900 106,033,700 119,723,300
(c) Valuation claimed in protests (a) minus (b). 294,480,875 304,692,475 301,221,150 283,343,200
(d) Final valuation found by Tax Commission_ 410,985,375 416,635,375 407,040,350 402,707,900
*391 16. After they became final, the assessment rolls for these years were duly sent to the Comptroller of the City of New York who, in turn, duly transmitted them, together with his proposed budgets and estimates of receipts, to the City Council. Thereafter the budgets for the years involved were duly adopted and the tax rates for each of those years were duly established by the City Council. The operating budget, as adopted, and the relation thereto of the revenues to be raised through real estate taxes, for each of those years is as follows:
Fiscal year Council meeting date From General funds Beal estate taxes Total city operating budget Percent of real estate taxes to total budget
1938[1]... Mar. 1... $124,098,396.18 78.97
1939[2] Mar. 3-. 68,093,896.38 79.91
1939-40. June 20_. 118,500,000.00 79.83
1940-41. June 21.. 80.33
1941-42. June 24.. 79.13
17. The plaintiff duly paid the real estate taxes, as billed, for those years and accompanied those payments with letters of protest. All of those tax payments were made under conditions and reservations similar to those for the year 1938, the accompanying letter of which read in part as follows:
Such payment as to each parcel so assessed is made involuntarily, and under protest and duress, and under compulsion of the penalties provided by law, and to avoid penalties, and to remove the lien of such taxes from the said properties of the undersigned Company. This payment as to each parcel so assessed is made without prejudice, and without admitting the validity of the purported assessments upon the said properties or of the taxes levied thereon, and without waiving any rights which the undersigned Company may have to contest the legality and validity of the said purported assessments, or the overvaluation or inequality in assessments resulting from such purported assessments, or of the taxes levied thereon and imposed upon the said properties and upon the undersigned Company; and the undersigned Company hereby expressly reserves all rights to contest the said purported assessments as to each of such parcels and the said taxes levied thereon upon any and all of the grounds permitted by law.
*392 18. Thereafter the plaintiff duly instituted proceedings for judicial relief and review by filing in the proper court timely petitions to review the final assessments, setting, forth, as required by the New York law, the grounds for relief and the respective amounts claimed to be the full and fair value of each individual parcel of property. All of the petitions alleged overvaluation; most of them also alleged inequality and illegality. The allegations of illegality were all based upon illegal method and form except those with respect to the supplemental assessments for the first half of 1939 which were addressed to the entire supplemental assessments.
19. The final assessments of the Tax Commission, the extent to which they were claimed to be overvalued and the full values as alleged in the petitions are as follows :
1938 1939 1939/1940 1940/1941
(a) Final assessed valuation.. $410,985,375 $416,635,375 $407,040,350 $402,707,900
(b) Overvaluation claimed in petitions.-. [1] 116,530,000 112,042,900 [1] 105,859,700 [1] 119,378,100
(c) Valuations alleged in petitions (a) minus (b)... [1]294,449,375 304,592,475 [1]301,180,650 [1]283,329,800
20. Under the law of New York, the plaintiff was bound by the valuations claimed in its petitions and thereby admitted liability for real estate taxes on the parcels of real estate involved to the extent of the product of the valuations thereon, as alleged, and the established tax rate for the years involved.
21. The protests and the certiorari proceedings with respect to the assessments for the calendar year 1938, the first half of the calendar year 1939, and the fiscal years 1939/1940 and 1940/1941, were bona fide and were filed, instituted, and prosecuted by the plaintiff in good faith.
The valuations therein claimed and asserted by the plaintiff with respect to each of the parcels were bona fide made in dollar amounts which represented the best business judgment of the responsible officers and management of the plaintiff as to the full value of the properties and the amounts that would ultimately be determined by the courts to be correct.
22. In addition to the knowledge and information of its own officers and employees with respect thereto, the plaintiff *393 engaged in the latter part of 1937 outside, independent appraisal experts to make appraisals of all of its properties. "While the appraisal job was in progress, the plaintiff’s officers and employees had many conferences and were in constant contact with the appraisers, whose reports and working papers were at all times made available to them. The appraisal values, as finally determined by the experts, were generally somewhat lower than the values set forth and claimed by the plaintiff in the protests and in the certiorari proceedings.
23. The certiorari proceedings with respect to the lump sum assessments for the years 1936 and 1937 were settled in the year 1940 for a lump sum amount, thereby avoiding the extended effort and detail necessary to allocate to each individual parcel the amount and basis of that settlement. After those suits were out of the way and in the latter half of 1941, the plaintiff received from the City of New York a proposal which served as a basis for settlement of the then pending certiorari proceedings with respect to the real estate assessments for the years 1938 through 1941.
24. Up to the time that proposal was received, the plaintiff had definitely intended to prosecute the then pending cer-tiorari proceedings to their ultimate conclusion. It was confidently felt by the officers and management of the plaintiff that the valuations claimed and asserted in the protests and in the certiorari proceedings, supported by certificated opinions of its experts arrived at through application of accepted methods of appraisal, would ultimately be sustained by the courts.
25. The proposal, however, contained a development that was considered very important in that it afforded an opportunity to fix bases and determine methods of assessing the plaintiff’s properties in future years in contrast with those employed in prior years that had resulted in expensive litigation. Another important consideration was the matter of public relations — the possible adverse effects of further extended controversy between the plaintiff, a public utility, and the City of New York, a part of the community it served. At that time municipal ownership of gas and electric plants was still a possibility.
*394 26. On the other hand, acceptance of the proposal meant surrender by the plaintiff of part of its claim which it felt justly entitled to and firmly believed would be recovered. It thus became a question of alternatives between continuing litigation and recovering the overpayments of real estate taxes of the past years, or sacrificing a part thereof for the savings and benefits to be derived from an agreeable and harmonious working arrangement and relationship in the future.
27. The plaintiff finally decided that the future benefits warranted acceptance of the proposal and surrender of part of the past values to which it considered itself entitled. The justification of this decision was borne out by the harmonious relationship and valuation stability that existed thereafter until 1947.
28. Accordingly, a stipulation for settlement of the pending proceedings was entered into, which constituted a compromise of the amounts to be recovered by the plaintiff and the valuations to be placed upon each parcel of real estate owned by the plaintiff. Based thereon the Corporation Counsel of the City of New York executed offers to allow final order, judgment or decree to be entered in said proceedings reducing the assessed valuations as agreed upon; orders thereon were entered with respect to each parcel; and stipulations of discontinuance dated August 29, 1941, were filed with the court. Pursuant thereto the City of New York made refunds to the plaintiff in 1941, aggregating $1,848,-679.75, of real estate taxes paid for the years 1938, 1939 and 1940. The settlement also took into account and reduced the assessed valuations for the fiscal year 1941/1942, for which protests had already been filed.
29. The aggregate amounts of the values actually contested, the extent of the reduction, and the extent of the retention of the contested values resulting from the compromise and the stipulations and orders entered thereon, are as follows:

*395

30. The amounts and the years in which the real estate taxes were paid and the deductions therefor taken in the plaintiff’s income tax returns, are as follows:

In 1941 the plaintiff paid an additional $5,626,518.25 real estate taxes, which represented the second half of the 1941/ 1942 real estate taxes, but no deduction for same was taken in its 1941 income tax return.
31. The valuations, as admitted in the plaintiff’s protests and petitions for certiorari, as contested therein, and as finally stipulated and adopted by the court, in terms of the real estate taxes set forth in the preceding finding, are as follows:

*396 32. The plaintiff was and is under the jurisdiction and supervision of the Public Service Commission of the State of New York (hereinafter referred to as P. S. C.) and kept its books and accounts in accordance with the “Uniform System of Accounts Prescribed for Gas Corporations” and the “Uniform System of Accounts Prescribed for Electric Corporations” established by orders of the P. S. C. dated June 16, 1937 and May 25, 1937, respectively, and in effect during the years involved herein. These Uniform Systems of Accounts constituted full and complete accrual systems of accounting.
33. Paragraph 228 in each of the Uniform Systems of Accounts dealing with Taxes Accrued provides as follows:
A. This account shall be credited during each accounting period with the amount of taxes accrued during the period, corresponding debits being made to the appropriate accounts for tax charges. Such credits may be based upon estimates, but from time to time during the year as the facts become known, the amount of the periodic credits shall be adjusted so as to include as nearly as can be determined in each year the taxes applicable thereto. Any amount representing a prepayment of taxes applicable to the period subsequent to the date of the balance sheet shall be shown under account 132, Prepayments.
B. The records supporting the entries to this account shall be so kept that the utility can furnish information as to the amount, by classes, of taxes accrued, the basis for each tax accrual and the accounts to which charged, and the amount, by classes, of taxes paid.
34. It was the plaintiff’s practice to accrue monthly upon its books its real estate taxes over the period covered by those taxes. These monthly accruals were entered upon the books on the basis of assessments regardless of when or how the payment of those taxes was made. The payment of the taxes had no relation to, or effect upon, such accruals, which were entered both before and after the payment of the taxes. Such accrual of the. real estate taxes conforms with the provisions and requirements of paragraph 228 of the Uniform System of Accounts (finding 33) and with the principles of accrual accounting.
*397 35. The accrual method of accounting as recognized by well-established principles of accounting is fundamentally different from the cash basis of accounting. Under a strict cash basis, transactions and events are not recorded until cash has been received or paid, without regard to the period to which they relate or the period in which the revenues or expenses apply. The accrual method, however, is based upon the principle of recording transactions and events as they occur, regardless of when the cash receipts and disbursements part of the activities takes place. Kevenues are accrued as nearly as practicable to the period earned, and expenses, which include taxes, are accrued and allocated in as reasonable and consistent a manner as possible in the period and against the revenues they helped to produce. The primary purpose of accrual accounting principles is to obtain a proper and fair determination of periodic income, often referred to as the process of matching costs against revenues, so that in each accounting period there will be deducted all the ascertainable costs necessary to produce the revenue, including indirect period costs such as depreciation, taxes and interest.
36. Under the accrual method of accounting, the payment of cash extinguishes a liability that either has already been recorded for purposes of determining income or is yet to be recorded for purposes of determining income, but it does not of itself have any effect upon the determination of income. It may either precede or survive the accrual or re-cordation and is a balance sheet transaction which reduces the cash asset and is balanced by a corresponding reduction of a liability or the substitution of another asset in its place, but it has no effect on the profit or loss — the income determination.
37. When the term “accrual” is used in a balance sheet sense, as distinguished from an income-determining sense, it could never survive payment because payment extinguishes the liability and eliminates it from the balance sheet. But in an income-determining sense, payment has no effect upon accrual which may or may not survive payment depending upon whether the payment is in extinguishment of a liability *398 already accrued or in prepayment of a liability to be incurred, determined, or accounted for at a later date or period.
38. Under accrual accounting, when payment is made with respect to a liability which is denied in whole or in part, the accounting principle as to charges against income would be the same as if payment had not been made; such payment would not affect the treatment of any accruals. This principle applies equally to the payment of taxes. The payment of the admitted or estimated ultimate liability constitutes the payment of a current charge or expense of operations and the balance of that payment represents an amount estimated to be ultimately recovered and is chargeable to a suspense, deferred debit, or other receivable account. The latter item represents an asset — a deposit which is expected to be recovered.
39. These generally accepted principles of accrual system of accounting apply to the real estate taxes involved herein and are recognized in the Uniform Systems of Accounts prescribed by the P. S. C. (See findings 32 and 33.)
40. In recording the accruals of the real estate taxes on its books, the plaintiff did so solely on the basis of the assessments made and without regard to their payment, or the amounts that were contested, or the amounts which, in the considered judgment of the plaintiff’s officers, would ultimately be eliminated. In all instances the accruals upon the plaintiff’s books either preceded or survived the payment of the taxes.
41. The accrual on the plaintiff’s books on the basis of the assessments without regard to their payment was in accord with the principles of accrual accounting and with the provisions of the Uniform Systems of Accounts promulgated by the P. S. C. However, the accrual on the basis of the assessments without regard to the amounts that were contested, or without taking into consideration the best judgment of management as to the plaintiff’s ultimate liability therefor, was not in accord with the principles of accrual accounting or the provisions of the Uniform Systems of Accounts. In its income tax returns for the years 1938,1939,1940 and 1941, the plaintiff claimed deductions for the real estate tax items *399 as they were accrued upon its books on the basis of these assessments.
42. The facts as above set forth may be simplified and illustrated by the following example which is applicable to all of the years involved herein:
(a) for the year 1939 plaintiff was notified on January 26, 1939, of a tentative assessment in the amount of_$100.00
(b) within the statutory period and by March 16,1939, plaintiff, based upon the best judgment of its officers, duly filed a bona fide protest admitting liability of_ 86.00
and petitioning for an administrative reduction of said tentative assessment of $100 by_ 15.00
(c) after hearing duly held and on or about May 25,1939 final assessment was made in the amount of_ 100.00
(d) thereafter on or about October 1,1939 under protest and for the stated purpose of avoiding liens, seizures, levies, penalties, interest, etc., and reserving all rights, payment was made of_ 100.00
(e) within the statutory period, on October 25,1939, certiorari proceedings were instituted admitting liability in the amount of, and denying liability in excess of_ $85.00
(f) on August 21,1941, the Supreme Court of the State of New York entered its order in said certiorari proceedings fixing the tax liability at_ 95.00
(g) in October 1941 plaintiff received a refund of the excess payment of_ 5.00
43. The treatment of this simplified example as accrued on the plaintiff’s books, as deducted on the plaintiff’s returns, as finally allowed by the Commissioner of Internal Revenue and as contended for by the plaintiff, is illustrated as follows:

1989

Accrued on plaintiff’s books-'_$100. 00
Deducted on plaintiff’s return_ 100. 00
Deductions allowed by Commissioner_ 95. 00
Deductions contended for by plaintiff_ 85.00

19 it

Added to income by Commissioner_ $5.00
Deductions contended for by plaintiff_ 10.00
An alternative contention advanced by the plaintiff is as follows:
(a) if $95 is to be allowed as a deduction in 1939, then the $5 does not constitute income in 1941; and
(b) if the $5 is to be included in the 1941 income, then the deduction for 1939 should be $100.
*400 44. The proper book entries of this example, according to well-recognized and sound principles of accrual accounting, and in accordance with the Uniform Systems of Accounts prescribed by the P. S. C. are illustrated by the following set of entries:

1939

(1) Dr. Tax expense_$85.00
Cr. Taxes accrued_ $85.00-
(To record the admitted liability for taxes for the year 1939)
(2) Dr. Taxes accrued_ 85.00
Deposit for contested taxes_ 15.00
Or. Cash_ 100.00-
(To record payment of the assessed tax, part of which is contested)

191,1

(3) Dr. Cash_ 5.00
Tax expense_ 10. 00
Or. Deposit for contested taxes_ 15. 00=
(To record final settlement of the contested taxes.)
45. Under the generally accepted and well-recognized principles of accrual accounting, the $15 in this example, which the plaintiff paid over and above its admitted liability of $85 for taxes in 1939, and which in the best judgment of' management would be recovered as soon as full legal proceedings were consummated, would constitute an asset until August 1941 when the settlement was made, and when for the first time the plaintiff had knowledge that instead of an asset of $15 it had only an asset of $5, and that the remaining $10 was, instead, an expense.
46. Under these accrual accounting principles, the $10 expense is accrued and deducted in 1941 and is not related back to 1939 because accrual accounting principles are based,, among other things, upon reasonableness and practicability. Under accrual accounting it would be considered unreasonable and impractical to go back and reopen closed years, the income of which had been determined upon an appraisal of‘ all facts then known. Subsequent developments are taken into consideration and recorded in the year when they occcur. If they occur immediately after the end of the year involved and before the books for that year are closed (it usually takes about 30 days to close the books of a substantial business, that are kept on an accrual basis), the same practical ap *401 proach would prompt taking those events into account in the prior year — but aside from this exception, under accrual accounting principles, the facts and developments are recorded in the year they occur.
47. In view of the complex computations involved herein, the parties hereto, without attempting to limit or preclude a determination herein that would involve a computation upon any other basis, have made and agreed upon computations of the amounts of income taxes overpaid or underpaid by the plaintiff, in the event the Court disposes of the issues herein upon any of the following bases:
A. Allowance as deductions in 1938, 1939, 1940 and 1941 of the amounts of real estate taxes admitted in those years to have been due[1] ($85.00); allowance as deductions in 1941 upon termination of the litigation of the additional amounts of taxes determined to be due over and above the amounts previously admitted ($10.00) ; and exclusion from 1941 income of amounts of excess payments of real estate taxes in said prior years that were refunded in 1941 ($5.00);
B. Allowance as deductions in 1938, 1939, 1940 and 1941 of the amounts of real estate taxes ultimately determined to have been due for said years ($95.00); and exclusion from 1941 income of amounts of excess payments of real estate taxes for said years that were- refunded in 1941 ($5.00);
C. Allowance as deductions in 1938, 1939 and' 1941 of amounts of real estate taxes paid in those years ($100.00); and inclusion in 1941 income of the amounts of excess payments of real estate taxes for said years that were refunded in 1941 ($5.00).
Such computations disclose the following underpayments (overpayments) of principal amounts of income taxes made by the plaintiff for the aforesaid years:
1938 — Docket No. 49654 1939 — Docket No. 49655 1940 [1] 1941 — Docket No. 50432 • ’
A-2 $450,987.74 [2]$434,602.51 $809,412.31 ($3,095,708.33)
b; 112,346.03 (673,090.72)
CL (128,329.55) (105,305.68)
*402 CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States one hundred twenty eight thousand three hundred twenty nine dollars and fifty-five cents ($128,329.55) in case No. 49654; and one hundred five thousand three hundred five dollars and fifty-eight cents ($105,305.58) in case No. 49655, with interest on each amount as provided by law.
The .plaintiff is not entitled to recover in case No. 50432 and its petition is therefore dismissed.

 See. 23. Deductions from gross income. In computing net income there shall be allowed as deductions: * * * (c) Taxes generally. * * » Taxes paid or accrued within the taxable year * * *.
See. 41. General rule. The net income shall be computed upon the basis of the taxpayer’s annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer * * *.
Sec. 43. Period for which deductions and credits taken. The deductions and credits * * * provided for in this chapter shall be taken for the taxable year in which "paid or accrued” or “paid or incurred”, dependent upon the method of accounting upon the basis of which the net income is computed, unless in order to clearly reflect the income the deductions or credits should be taken as of a different period. * * *
Sec. 48. Definitions. When used in this chapter — (c) “paid' or incurred,” “paid or accrued.” The terms “paid or incurred” and “paid or accrued” shall be construed according to the method of accounting upon the basis of which the net income is computed under this Part.

 The City of New York interpreted the provisions of the City Charter with respect to this interim period (first half of 1939) as enabling it to reassess the parcels of real estate in their entirety and not merely the additions and retirements. Accordingly the Tax Commission fixed tentative supplemental valuations for 29 parcels of plaintiff's property in the aggregate amount of $234,850,450, of which $229,200,450, was on properties assessed in 1933 and $5,650,000, represented the net valuations of additions less retirements. Plaintiff filed timely and proper applications for correction of the supplemental assessments claiming illegality as well as overvaluations in the aggregate amount of $51,026,000. The Tax Commission fixed the final assessments in the aggregate amount of $234,850,450.

 Although plaintiff's income tax for taxable year 1940 is not involved herein (no refund claims or petitions have been filed for said year) the facts and figures with respect to the real estate taxes assessed and paid during that year are set forth because they affect plaintiff's income tax liability for the year 1941.

 Calendar year.

 6 months Jan. 1 to June 30.

 These amounts are slightly lower than the amounts set forth in the protests (see finding 15) because of the slight reduction in values granted by the Tax Commission.

 Not before the court herein — computation included to complete the record,

 Barred by the statute of limitations except to the extent it may be governed by see. 3801 of the Internal Revenue Code.

 The figures in parentheses are the comparable figures in the simplified example referred to in finding 42.