Julian C. STANFORD and Elizabeth C. Stanford, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 17279.

United States Court of Appeals
Ninth Circuit.

Oct. 23, 1961.

Valentine Brookes, Paul E. Anderson, and Richard A. Wilson, San Francisco, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney and William A. Friedlander, Attys. Dept. of Justice, Washington, D. C., for respondent.

Before HAMLEY, JERTBERG and MERRILL, Circuit Judges.

JERTBERG, Circuit Judge.

Before us are petitions for review of the decision of the Tax Court of the United States, reported at 34 T.C. 1150. The petitioners are husband and wife, who filed separate income tax returns on the cash basis for the taxable year 1955. The husband, Julian C. Stanford, will hereafter be called the taxpayer.

The basic and broad question raised by the petitions for review is whether or not the receipt by petitioners in 1955 of 45,-000 German marks ($10,662.48) from Kaufhof A.G., a German corporation [the Corporate successor of Leonhard Tietz A.G.], represents taxable income

under the provisions of the Internal Revenue Code.

The Tax Court found as a fact that the payment represented a pension paid to petitioners for services previously rendered by the taxpayer to Leonhard Tietz A.G., and accordingly determined and ordered a deficiency in income tax for the taxable year 1955 in the amount of $1,-326.30 in the case of the taxpayer, and $1,411.40 in the case of taxpayer's wife.

The background facts are not in dispute but must be stated in some detail in order to give focus to the questions of law which must be resolved. The essential facts may be summarized as follows: Petitioners were born in Germany and were citizens and residents of that country until July 1937, when they left Germany for Holland. The petitioners are of Jewish extraction. The taxpayer was born April 22, 1890, and had been employed since 1909 by Leonhard Tietz A.G., the corporate predecessor of the German corporation which made the payment to the petitioners in 1955. This predecessor corporation was engaged in the retail department store business. The taxpayer became a director and officer of the predecessor corporation in 1920, and became the owner of approximately five per cent of the total outstanding stock of the corporation, and received an annual salary of 45,000 marks plus three per cent of the net profits of the corporation. In 1927 taxpayer entered into a contract of employment with the corporation. The initial term of the contract was for a period of ten years, and was automatically to extend for additional periods of five years unless cancelled before the expiration of the ten-year term or any subsequent five-year term. The contract provided that either the corporation or the taxpayer had the right to demand the pensioning of taxpayer upon his reaching 65 years of age or should taxpayer be unable to work, in either of which events taxpayer was to receive a pension of 30,000 marks until his death. The contract also contained a provision for pension payments to taxpayer's wife in the event taxpayer should predecease her.

Prior to the rise to power of Adolf Hitler the par value of the common stock held by taxpayer was 1,600,000 marks. In 1930 the stock had a market value of approximately 300 per cent of its par value. At such time petitioners owned a large residence in the City of Cologne, the construction of which cost taxpayer 500,-000 marks. Taxpayer also owned a second home which had been purchased for 110,000 marks.

On January 30, 1933, Adolf Hitler became Chancellor of Germany. Thereafter the National Socialist (Nazi) Party, led by Hitler, was in control of Germany. One of the primary purposes of the Nazis was the complete elimination from Germany of persons of Jewish extraction. In accordance therewith the German Government under Hitler enacted many discriminatory laws against the Jewish residents of Germany.

On April 1, 1933, the German Government proclaimed a boycott against all department stores in Germany owned or controlled by Jewish persons. All such stores were closed. On the same date all the Jewish directors of Leonhard Tietz A.G. resigned in order to keep the stores open. The business of the Tietz firm was boycotted by members of the Nazi Party and Brown Shirt Guards. The business of Leonhard Tietz A.G. dropped by approximately 55 per cent during the first year of the boycott. The Nazi Government insisted that the Tietz firm elect only non-Jewish directors and transfer the capital of the corporation into non-Jewish hands. Taxpayer, however, was subsequently invited by a new board of directors to return to the board and he again served there until September 1934, when he was forced by the Nazi Government to resign. Taxpayer thereafter opened a consulting business and continued to consult with the members of the former Tietz firm, the name of which was changed to Kaufhof A.G. After the close of 1936 he rendered no further service of any kind to the Kaufhof firm.

During 1933 taxpayer was forced to sell his stock in the Tietz firm for which he received 200,000 marks.

Due to the oppression and discriminatory laws of the Nazi Government petitioners suffered further substantial losses. They were required to dispose of their residence which had cost them approximately 500,000 marks to build for a price of 180,000 marks. After leaving Germany they sold a second home for 50,000 marks that had been purchased for 110,000 marks. Upon leaving Germany in 1937, petitioners were required to pay a tax in the amount of 100,000 marks, which was measured by 25 per cent of their total assets. At the time they left Germany they had bank accounts totaling approximately 300,000 marks, but were able to recover only six to seven per cent of their bank balances in 1938 while living in Holland. In June 1937 petitioners fled Germany and went to Holland where they were still residents at the time Holland was occupied by Nazi forces during 1940. Taxpayer was arrested on August 12, 1940, by the Gestapo and was imprisoned for a period of nine months. Upon his release from prison he was required to pay the Gestapo 3,200 to 3,500 marks for his board and lodging. In 1942 the petitioners contacted the underground movement in Holland and went into hiding. They stayed in hiding with underground protection for a period of approximately three years, until Holland was liberated in May 1945.

In 1945 taxpayer executed a power of attorney to a Dutch law firm authorizing it to file claims for damages against Kaufhof A.G. On May 12, 1949, the Military Government of the British Zone of Occupation in Germany adopted Law No. 59, which provided for the restitution of property to persons wrongfully deprived thereof within the period January 30, 1933 to May 8, 1945, for reasons of race, religion, etc. Under this law claims for restitution accrued to any person whose property was wrongfully confiscated. The party made liable for payment of such restitution under this law is defined therein as "the present possessor of confiscated intangible property or the present holder of a confiscated intangible interest." This law prescribes

a detailed system of procedure for the filing and adjudication of such claims. A substantially identical law was adopted by the United States Military Government in the American Zone of Occupation in Germany and was likewise designated as Law No. 59.

In 1947 petitioners emigrated to the United States where they have since resided continuously. On November 5, 1952, they became naturalized citizens of the United States.

On June 14, 1949, Kaufhof A.G. advised taxpayer by letter that it would "resume payment" of his pension in the amount of 30,000 marks per year. The letter sent by Kaufhof to taxpayer reads in pertinent part as follows:

"This is to confirm that we will resume payment of your pension of DM 30,000 p.a. to which you are entitled on account of prior contracts, effective July 1, 1948, and we reaffirm below the salient features of these contracts:

"On your death your surviving widow is to receive a widow's pension in the identical amount of DM 30,000 p.a. until her death.

"The widow's pension will terminate upon your wife's remarriage.

"In all cases in which no widow's pension is to be paid, your children will receive on your death a pension until they are able to support themselves, but in no case after their 25th birthday, and, in the case of daughters, if they marry before, then only until date of marriage.

"The orphan's pension will amount to $\frac{1}{3}$ of the widow's pension for each child. However, the aggregate amount payable to all of your children may in no event exceed the widow's pension.

"All payments are due and payable monthly in equal installments at the end of the month.

"We confirm further that in case of deterioration of the value of the money within Germany (translator's note: inflation or increase of C.O.L.)

your pension or that of your widow or children will be increased proportionately and raised in the same percentage as the pension payments to other recipients of pension of this corporation or of members of the Board of the Corporation to whom pension commitments have been made, including such fringe benefits (insurance or otherwise) which are being paid or have been contracted to be paid to such persons.

\*   \*   \*   \*   \*   \*

"All claims which you may have for whatever cause for any period of time prior to June 30, 1948, are unaffected by this agreement."

On November 23, 1949, the Court of Restitution at the Court of Justice in Cologne, Germany, entered its decree in the matter of restitution claims of Julian C. Stanford et al. v. Kaufhof A.G. The decree provided in substance that Julian C. Stanford was entitled to receive 48,550 marks arising out of claims for salary and pension from Kaufhof A.G. in consideration of the fact that he had been required by the prewar German Government to transfer his residence to another country and that Kaufhof had suspended payments to him. This decree contained a general release of all claims of taxpayer against Kaufhof up to June 30, 1948.

In 1950 Kaufhof, pursuant to taxpayer's claim, paid him 500,000 marks for the stock in the corporation which he had been forced by the Nazi Government to relinquish. The aggregate cost of the stock was 1,600,000 marks. During 1954 taxpayer made a demand against Kaufhof for an additional 200,000 marks for the loss of his stock. Kaufhof refused to pay this claim.

Petitioners presented claims for other war and prewar losses and have effected recoveries thereon as follows:

(1) A claim for a loss in the amount of 300,000 marks on the sale of their place of residence in Cologne, which was allowed against the purchaser of the home in the amount of 110,000 marks.

(2) A claim for the loss of a second residence in the amount of 60,000 marks,

which was allowed against the purchaser of that residence in the amount of 54,000 marks.

(3) A claim against the German Government for 100,000 marks for the tax in that amount petitioners were required to pay upon leaving Germany. This claim was allowed to the extent of 20,000 marks.

(4) A claim for compensation for the time taxpayer was imprisoned and lived underground in Holland was allowed in the amount of 2,200 marks.

In 1953, the German Government passed a supplemental law relating to compensation of victims of National Socialist persecution. This statute was enacted for the purpose of providing indemnification to persons persecuted by the Nazis and permitted such persons to recover against the German Government for the loss of liberty, personal injuries, and property confiscated by the Government, including discriminatory taxes.

On April 28, 1955, petitioners' attorney and Kaufhof entered into a memorandum agreement, which provided in part as follows:

"Re: Pensions of the Tietz Group.

"I.

"1.) On April 28, 1955 there took place, in connection with the preceding exhaustive deliberations with Dr. Klonz, a discussion with Dr. Ising of the more particular details of the increase of pensions of the following members of the Tietz-Group:

\*    \*    \*    \*    \*    \*

"b) Mr. J. C. Stanford, 1008 Middlefield Road, Berkeley 8, Calif., USA

"2.) In principal the retirement allowances shall be raised by 50 per cent.

"3.) The increases take effect from January 1st 1955."

The agreement also provided a formula for increasing the pension payments in the event of increases in the cost of living.

Taxpayer attached to his income tax return for 1955 a statement which reads in part as follows:

"Pursuant to a pension agreement entered into in the course of his employment by the Tietz Company, which agreement has been recognized as a valid and subsisting legal obligation of Westdeutsche Kaufhof A.G. the taxpayer is now receiving a regular pension from the said firm based upon and solely attributable to his past activities as an employee of Tietz A.G."

From the foregoing, the court found as a fact that "the payments in the amount of $10,662.48 received by petitioners from Kaufhof A.G. in 1955 represent the payment of his (taxpayer) pension for that year."

■  Taxpayer first contends that such finding of fact is contrary to the substantial weight of the evidence before the Tax Court, the substantial weight of which taxpayer alleges establishes that such payments were made as:

Reparations for:

(1) Personal injuries suffered by petitioners summarized as:

(a) In 1935 and 1936 petitioners were the victims of various acts of anti-Jewish discrimination. .

(b) In 1937 petitioners felt compelled to flee Germany, the land of their birth, because of the mounting acts of discrimination against them.

(c) In 1937 petitioner Julian C. Stanford was arrested by the Gestapo and held one day.

(d) On August 12, 1940, petitioner Julian C. Stanford was again arrested by the Gestapo without charges, without a hearing, and without a lawyer; he was transported back to Germany, tried, acquitted and permitted to return to his wife in Holland after nine months in prison.

(e) In Holland petitioners were forced to wear a yellow star identifying themselves as Jews.

(f) In fear of their lives, petitioners went into hiding with the Dutch under-

ground and lived in hiding for a period of three years.

(2) And to the extent that such payments did not represent reparations for personal injuries, as reparations for losses on account of properties confiscated by the Third Reich in excess of recovery, which petitioners summarize as follows:

| Item | Cost | | Recovery | | Unrecovered Cost | |
|------|------|--|----------|--|------------------|--|
| Leonhard Tietz stock | 1,600,000 | M | 500,000 | M | 1,100,000 | M |
| First home | 500,000 | | 290,000 | | 210,000 | |
| Second house | 110,000 | | 105,000 | | 5,000 | |
| Reichfluchsteur | 100,000 | | 20,000 | | 80,000 | |
| Bank Accounts | 300,000 | | 20,000 | | 280,000 | |
| Miscellaneous property | 15,000 | | — | | 15,000 | |
| Imprisonment lodging | 3,200 | | 3,200 | | | |
| Attorneys fees | 4,000 | | — | | 4,000 | |
| | | | | | 1,694,000 | M |

Taxpayer next contends that even if the finding of fact of the Tax Court is correct, the decision of the Tax Court is contrary to law.

We will first consider taxpayer's contention that the substantial weight of the evidence establishes that the payments received in 1955 were reparations for personal injuries and property losses sustained by petitioners and hence not includable in gross income under Section 104(a) (2) of the Internal Revenue Code of 1954.[1]

In support of his position taxpayer relies in part upon a ruling published by respondent which specifically exempts from income tax certain indemnification payments made by the Federal Republic of Germany to former German citizens now citizens or residents of the United States who were persecuted by the National-Socialist regime which are in the nature of reimbursement for the deprivations of civil or personal rights. (Rev. Rul. 57–505, 1957–2 C.B. 50. See also Rev.Rul. 56–518, 1956–2 C.B. 25.)

Taxpayer seeks to buttress his position by calling to our attention:

(a) That petitioners have received nothing on account of personal injuries which they suffered; (b) that petitioners have not been made whole for property losses sustained; (c) that in correspondence received by petitioners, Kaufhof A.G. expressed regret at persecutions suffered by petitioners; (d) that in 1955 Kaufhof A.G. increased the payments to taxpayer from 30,000 marks, the amount of the original contract obligation, to 45,000 marks; (e) that the Tax Court refused to receive in evidence a 1957 writing from Kaufhof A.G. which, taxpayer asserts, supports his view as to the reason for the increase in the amount of the 1955 payments; (f) that petitioners' expert in German law expressed the opinion that the practical effect of payments made by Kaufhof A.G. to taxpayer disqualified petitioners from receiving indemnification from the post-war German government, which indemnification, if made, would be exempt from taxation

---

1. Section 104.
"Compensation for injuries or sickness.
"(a) In general.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under Section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

\*   \*   \*   \*   \*

"(2) The amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness; \* \* \*."
26 U.S.C.A. § 104(a) (2).

under the revenue rulings above mentioned.

There is no evidence that the personal injuries suffered by petitioners resulted from any action of Kaufhof A.G. There is evidence that the payments by Kaufhof A.G. to taxpayer did not bar all reparation payments by the German government to petitioners. In fact, the record shows petitioners have recovered reparations for some of such losses without tax incidence. There is substantial evidence that Kaufhof A.G. considered the payments made to taxpayer in 1955 were pursuant to taxpayer's contract with Tietz A.G. and were intended to and did represent payment of taxpayer's pension for 1955. There is evidence that taxpayer so considered such payments. There is evidence that the increase in the amount paid in 1955 was a blanket increase due to inflation, which increase was contemplated in the letter of June 14, 1949 from Kaufhof A.G. wherein taxpayer was informed that pension payments would be resumed, and that such percentage increase was payable to all persons similarly entitled to pensions under the pension plan adopted by Tietz A.G. in 1927. Attention is also called to the memorandum agreement of April 28, 1955 with Kaufhof A.G. relating to pensions of the Tietz A.G. group. We have considered taxpayer's contention that the Tax Court erred in refusing to admit into evidence the 1957 writing from Kaufhof A.G. At its best such letter is only cumulative to other evidence admitted by the Tax Court, but which the Tax Court found not persuasive. In our view, the error, if any, cannot be considered prejudicial.

At most, the evidence to which taxpayer refers serves only to create a conflict in the evidence from which, perhaps, differing inferences may be drawn. The evidence, as a whole, does not compel a finding that the payments in 1955 were made to discharge an obligation of the German government.

We are unable to agree with taxpayer's contention that the finding of the Tax Court is erroneous. On the contrary, a review of the record before the Tax Court discloses abundant substantial evidence supporting the finding that the payments in 1955 represent payment of taxpayer's pension for that year.

■ Taxpayer presents for our consideration the additional argument that he has realized no gain on payments from Kaufhof A.G. because the amounts received are insufficient to compensate petitioners for capital losses sustained in Germany. The rule is that an investor whose capital is wrongfully seized by a foreign government realizes no gain upon restoration of such capital until all such lost capital is recovered, regardless of the fact that the amount of the award includes a sum designated as interest. See Speyer v. C. I. R., 77 F.2d 824 (2 Cir., 1935). Helvering v. Drier, 79 F.2d 501 (4 Cir., 1935).

However appealing theoretically may be an analogy between such an investor and one who has had the fruits of his labor wrongfully confiscated, this analogy finds no support in our tax laws. All income from personal services, including pensions, must be regarded as ordinary income. Title 26 U.S.C.A. § 61. And no provision for treating such income as a capital gain under any circumstances is found anywhere in the code. See Title 26 U.S.C.A. §§ 1221, 1222. Moreover, only certain personal losses for which deductions are specifically allowed may reduce gross income. Title 26 U.S. C.A. § 63(a). And deductions for such losses may be taken only in the taxable year in which they occur. Title 26 U.S. C.A. § 165.

Moreover, our tax laws do not contemplate personal losses resulting from wrongful unconstitutional action by our government, and accordingly no provision is found allowing special tax treatment of payments for services performed antedating such losses. Taxpayer's position cannot be reasonably compared to that of an ordinary taxpayer, and taxpayer's frustration with the claimed inadequacy of our tax laws is understandable. However, we cannot provide relief where Congress has not seen fit to make special pro-

visions to meet the exceptional circumstances present in this case.

■ Since the amounts received by taxpayer in 1955 must be regarded as ordinary income, we next consider the question of whether such income is exempt under two statutes exempting from taxation certain income from sources outside the United States. We consider first the applicability of Title 26 U.S.C.A. § 911.[2]

Taxpayer argues at the outset that petitioners meet all requirements of this statute, i. e., they are citizens, they have been bona fide residents of a foreign country or countries, the payments are received from a source outside the United States, and the payments are attributable to income earned during the period of foreign residency. No language in the statute requires that these requirements be met contemporaneously, and it is suf-

ficient that they be met piecemeal. There is however language in the statute which raises some doubt as to the applicability of the statute to taxpayer. The requirement of bona fide residence is qualified by the requirement that such bona fide residence must be "for an uninterrupted period [including] an entire taxable year."

It is difficult to explain the existence of such a requirement except on the assumption that the drafters of the statute had in mind only persons who at the time of their foreign residence had a relationship with the United States which would cause income earned by them to be reportable and thereby give them a "taxable year." Taxpayer, who was admittedly at the time of his foreign residence a non-resident alien earning no income taxable by the United States, cannot be said to have such a relationship, and the requirement of bona fide residence "for an

2. "§ 911. Earned income from sources without the United States.

"(a) General rule.—The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

"(1) Bona fide resident of foreign country.—In the case of an individual citizen of the United States, who establishes to the satisfaction of the Secretary or his delegate that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, amounts received from sources without the United States (except amounts paid by the United States or any agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

"(2) Presence in foreign country for 17 months.—In the case of an individual citizen of the United States, who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period, amounts received from sources without the United States (except amounts paid by the United States or

an agency thereof) if such amounts constitute earned income (as defined in subsection (b)) attributable to such period; but such individual shall not be allowed as a deduction from his gross income any deductions (other than those allowed by section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph. * * *

"(b) Definition of earned income.—For purposes of this section, the term 'earned income' means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 per cent of his share of the net profits of such trade or business, shall be considered as earned income. Aug. 16, 1954, 9:45 a. m., E.D.T., c. 736, 68A Stat. 289."

uninterrupted period including an entire taxable year" is meaningless as to him without presupposing such a requirement.[3] Had Congress merely intended to require the foreign residence to be for a reasonable length of time, it would not have been necessary, and would have actually been illogical to express this requirement in terms of "entire taxable years," a measurement most difficult to apply to persons not subject to taxation under our laws.

We think that the difficulty noted above is at least sufficient to make the statute ambiguous on its face. We thus reject the view of taxpayer that the plain language of the statutes cover petitioners, and we also reject the view of the Commissioner that the plain language of the statute excludes petitioners. In order to resolve the ambiguity we refer to the legislative history.

It is conceded by petitioners that the predecessor of Section 911(a), enacted in 1926, expressly required the foreign residence and citizenship of the taxpayer to be concurrent, and that this requirement was perpetuated through subsequent reenactment of the statute down to 1951, at which time the statute was amended and the present language inserted.[4]

In 1951 the amendment changed the language in the predecessor statute from "is a bona fide resident" to "has been a bona fide resident" and "during the en-tire taxable year" to "for an uninterrupted period which includes an entire taxable year." Also, a new section was added extending the benefits of the exemption for the first time to any individual citizen "who during any period of 18 consecutive months is present in a foreign country or countries during at least 510 full days in such period * *." 26 U.S.C.A. § 911(a) (2) 1954 Code.

The Senate Finance Committee offered the following reasons for the change:

"Two disadvantages of section 116 (a) (1) and (2), as now written, are (1) that the citizen who assumes bona fide residence in a foreign country in a given taxable year after a portion of such year has expired is in no case permitted the exclusion with respect to that year irrespective of the duration of the period of bona fide foreign residence in years subsequent to that in which such residence has been taken up, and (2) the residence requirement operates to deny the exclusion privilege to individual citizens of the United States who are employed in foreign countries for extended periods of time and have not in fact or law become a bona fide resident of a foreign country.

"This section amends section 116 (a) (1) to provide that an individual citizen of the United States will be permitted to exclude from gross in-

---

3. Petitioners correctly point that non-resident aliens may sometimes have a taxable year. 26 U.S.C.A. § 871. But this occurs only when a non-resident alien earns income from sources within the United States. Petitioners are not in this category. The only persons who in our view can be said to have a taxable year are those whose relationship to the United States requires them to report income, i. e., citizens, resident aliens and non-resident aliens who earn income within the United States. At the time of their foreign residence petitioners' income from without the United States was not required to be reported. 26 U.S.C.A. § 872.

4. The original statute provided: "In the case of an individual citizen of the United States, a bona fide nonresident of the United States for more than six months during the taxable year, amounts received from sources without the United States * * *." Section 213(b) (14) Revenue Code of 1926, 26 U.S.C.A. Int. Rev.Acts. Immediately prior to the amendment in 1951 the statute provided: "In the case of an individual citizen of the United States, who establishes to the satisfaction of the Commissioner that he *is* a bona fide resident of a foreign country or countries *during the entire taxable year*, amounts received * * *." (emphasis ours.) Section 148(a) (1) Revenue Act of 1942, 26 U.S.C.A. Int. Rev.Acts. See also Section 116(a) (1) Revenue Code of 1939, 26 U.S.C.A. § 116(a) (1).

come all such earned income to which the section now relates which is attributable to an uninterrupted period of foreign residence, if the taxpayer establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for such uninterrupted period which includes an entire taxable year. This will permit the exclusion with respect to the part of the taxable year subsequent to the taxpayer's becoming a bona fide resident, if the taxpayer eventually comes within the other requirements of section 116(a) (1). The qualifying period of a bona fide residence must be continuous and uninterrupted; however, trips to the United States for purposes of business or vacation will not disqualify the taxpayer from satisfying bona fide residence requirements. The bona fide residence rule is the same as the present law * * *." S.Rep.No. 781 Part 2, 82nd Cong. 1st Sess. p. 38 (1951–2 Cum.Bull. 571).

█ We find nothing in this Committee report or elsewhere in the legislative history to indicate that Congress ever entertained any intention of broadening Section 911(a) (1) to include within its coverage a class of persons clearly excluded from coverage prior to 1951, i. e., nonresident aliens who earn income abroad and receive said income after becoming naturalized citizens. At the same time we are aware that it has been judicially recognized that the purpose of the predecessor statutes to the present 911(a) (1) was to encourage American citizens to seek employment abroad in order to encourage foreign trade. C. I. R. v. Fiske's Estate, 128 F.2d 487 (7 Cir. 1942). Moreover, this statute, as an exemption statute, is a matter of legislative grace, and we are bound to construe it strictly in light of the objectives and purposes which Congress designed it to subserve. C. I. R. v. Swent, 155 F.2d 513 (4 Cir. 1946).

Against this background taxpayer urges upon us arguments based on in-ferences of a change in the law from a change in the language of the statute. But the suggested inferences are not only at variance with the stated purposes of the drafters of the 1951 amendment in changing the language of the statute, but also they are inconsistent with the legislative history and judicial interpretation of the statute and totally unsupported by anything in the background of the statute. Under such circumstances very little weight can be allowed to these inferences, and we must conclude that the legislative history is very strongly contrary to the resolution of the ambiguity of the statutory language in favor of taxpayer.

█ We are aware of Supreme Court decisions which require the express language of tax statutes to be followed even when the result was probably not contemplated by the drafters and taxpayers may receive an unexpected windfall. Lewyt Corp. v. C. I. R., 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029 (1955); Commissioner of Internal Revenue v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959). However, we have held that the express language of Section 911(a) (1) does not clearly cover taxpayer but that an ambiguity exists as to whether taxpayer's bona fide foreign residence was "for an uninterrupted period which includes an entire taxable year."

As we have indicated we would not feel justified in inferring from this language standing alone that Congress intended to impose a requirement that citizenship and bona fide residence concur, since this would be an oblique manner of stating such a requirement. However, we do believe that the use of such language is consistent with the intention of Congress not to abandon a requirement of concurrence of citizenship and residence which was expressed in the statute prior to 1951, particularly when the legislative history is totally silent as to any intention to change this requirement and unrelated reasons for changes in language are shown. From this we reach the conclusion that the requirement of concurrence of citizenship and foreign

residence explicit in the pre 1951 statute carries over into the present Section 911 (a) (1) and accordingly petitioners do not meet the requirements of this statute.

Taxpayer contends that such a construction of 911(a) (1) discriminates against naturalized citizens in violation of a declared Congressional policy. The statute however does not discriminate against naturalized citizens who go abroad and establish bona fide residence in a foreign country for an uninterrupted period which includes an entire taxable year. Such naturalized citizens receive the same tax exemption as natural born citizens who do the same. We are of the view that Congress can, if it so chooses, provide different tax treatment for U.S. citizens, whether naturalized or natural born, who elect to forego privileges and advantages of U. S. residence by living and working abroad on the one hand, and on the other hand persons of foreign extraction who come to live in the United States and become citizens and acquire privileges and advantages therefrom, while continuing to receive income from sources outside the United States. We feel that considerations for granting tax exemptions to these two rather distinct classes of individuals are sufficiently distinct so that an express discrimination between them would not be arbitrary or unreasonable. If Congress can reasonably make such a discrimination, we are not bound to construe Section 911(a) (1) to include both classes of taxpayer contrary to the language of the statute as construed in the light of its legislative history.

Taxpayer further contends that the income received by petitioners in 1955 is exempt under Title 26 U.S.C.A. § 872, which provides:

"(a) General rule.—In the case of a nonresident alien individual gross income includes only the gross income from sources within the United States."

It is a general rule of construction that when a statute is part of an organic whole, the statute should be viewed in context with the whole of which it is a part. See Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510 (1955). Section 872 of the 1954 code is part of a body of tax statutes which deal specifically with the taxation of non-resident alien individuals for income earned within the United States. Title 26 U.S.C.A. §§ 871–876 1954 Code. Viewed in this context it is seen that Section 872 provides that when a non-resident alien is required to report income earned within the United States, such an alien need not include in his gross income earnings by him from sources without the United States. It is only in this context that Section 872 has any meaning since viewed alone it merely states an obvious jurisdictional limitation on the taxing power of the United States. It is equally clear from this analysis that Section 872 is of no help to taxpayer who is not a non-resident alien required to report income from within the United States, but rather a citizen taxpayer claiming an exemption from income earned abroad.

Taxpayer points out that he was a non-resident alien at the time when the fixed right to receive the pensions was acquired and at the time when the services were performed for which the payments received are compensation. However, we have already held that payments of the type received by taxpayer must under our tax laws be treated as ordinary income in the year received. Title 26 U.S. C.A. § 61. And there is no authority in the code for treating them otherwise. Clearly if taxpayer had continued in the status of a non-resident alien the United States would have never acquired jurisdiction to tax any income earned by him from sources outside the United States. However, taxpayer voluntarily altered this status, becoming a resident alien in 1947 and a citizen of the United States in 1952, before receiving the payments in question. When the payments were received taxpayer was a citizen of the United States. As a citizen he was then and is now subject to the taxing power of the

United States, which includes the power to tax income earned abroad. See Cook v. Tait, 265 U.S. 47, 44 S.Ct. 444, 68 L. Ed. 895 (1924). Congress has seen fit to pass only one statute exempting the income earned abroad which it has the power to tax, and we have held that that statute, Section 911(a) (1), was not intended to cover persons in taxpayer's class. We must hold that Congress has not seen fit to remove the income here received from the all-encompassing ambit of Title 26 U.S.C.A. § 61.

Taxpayer argues that the facts of the present case are analogous to Crispin v. United States, 200 F.2d 99 (9 Cir.1952). Crispin, a citizen of the United States, resided and was employed continuously in China from 1931 to 1941 when he returned to the United States. He participated in a group annuity plan of his employer whereby both employer and employee made contributions to an insurance company for an annuity agreement payable to Crispin during his lifetime, conditioned on his remaining in his employer's employ until he became eligible for retirement. Crispin became eligible for retirement in 1940 at which time the employer's contributions to the retirement plan aggregated $30,631.68 and Crispin's contributions totaled $2,156. The court stated that if Crispin had given his services in the United States he would have been entitled to compute the annuities he received from the insurance company under Section 22(b) (2) (a), Title 26 U.S.C. § 22(b) (2) (a), 1952 edition, which provided:

"* * * amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity."

The government contended that Crispin was not entitled to compute his annuity receipts in 1943 and 1944 under the 3 per centum provision because he was exempted from taxation on the annuity contract premiums paid by the employer for services rendered in China under Title 26 U.S.C. § 116(a) (3) and 119(c) (3), 1952 edition, both of which relate to exclusion from gross income of income earned from sources without the United States. The court held that it was in accord with Congressional purpose to encourage such foreign employment that Crispin should have the tax benefit arising from the annuity contract there received. It is obvious that the facts in Crispin are in no manner analogous to the facts of the instant case. The payments made to taxpayer in 1955 were not derived from an annuity contract acquired by taxpayer while in Germany. Moreover, Title 26 U.S.C.A. § 872 does not create a tax benefit analogous to that created by Title 26 U.S.C.A. § 911(a) which we have held does not apply to the class of individuals which includes taxpayer.

The decisions of the Tax Court are affirmed.